No. 64,712

STATE OF KANSAS, *Appellee*, v. ST. JOHN TYLER, *Appellant.*

(840 P.2d 413)

Opinion filed October 30, 1992.

*Jessica R. Kunen,* chief appellate defender, argued the cause and was on the briefs for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

HERD, J: This is a direct appeal by St. John Tyler from his convictions and sentence for sale of cocaine, K.S.A. 1991 Supp. 65-4127a; second-degree murder, K.S.A. 21-3402; aggravated assault of a law enforcement officer, K.S.A. 21-3411; possession of heroin with intent to sell, K.S.A. 1991 Supp. 65-4127a; possession of cocaine with intent to sell, K.S.A. 1991 Supp. 65-4127a; and perjury, K.S.A. 1991 Supp. 21-3805. Prior to his trial, Tyler pled guilty to conspiracy to sell cocaine, K.S.A. 21-3302 and K.S.A. 1991 Supp. 65-4127a.

The facts reveal that in the evening of February 2, 1988, Lyndon Clarence Bobo, at the direction of Sedgwick County Sheriff's Office, made a controlled buy of cocaine at 2432 N. Piatt in Wichita. Bobo was admitted through the front door by a tall black man later identified as George Payne. Once inside, Bobo purchased $140 worth of cocaine from a white female later identified as Pamela Tafoya. At the conclusion of the transaction, Bobo told the woman he wanted to come back later that evening and buy an "eight ball." He did this to ensure people would be in the house when a search warrant was to be executed. While inside the house, Bobo did not see any guns.

As a result of the controlled buy, Sedgwick County Sheriff's officers obtained a warrant to search 2432 N. Piatt. Prior to executing the warrant, the officers who were going to be involved met to discuss their assignments and the procedure for executing the warrant. Detective Sergeant Danny Bardezbain was in charge of this pre-search warrant conference. The officers knew there would probably be six or seven people in the house. The officers also knew there would be a bodyguard at the door, who carried a hammer, and that this individual had a reputation for being very mean. In addition, the officers knew that Bobo had observed an individual on the premises known as "Big Man" (Rudolph O. Hudson), who sometimes carried a gun.

Bardezbain had a diagram of the house and drew on it the assignment each officer was to follow once inside the house. Eight officers were assigned to enter the house, while four other officers remained outside. The officers' order of entry, dress, and assignments were as follows:

1. Uniformed sheriff's officer James McNutt was to open the screen door if it was locked and be the first officer inside the residence. McNutt carried a shotgun and was assigned to secure the living room, once inside.

2. Detective James Woods was to be the second person inside and was assigned to cover the southeast bedroom and bathroom. Woods wore a blue cloth windbreaker with a cloth sheriff's badge on the front and large yellow letters across the back that said "SHERIFF'S NARCOTICS." Woods also wore a blue ballcap with a cloth sheriff's badge on the front.

3. Detective Terry McNett, dressed like Detective Woods, wore a bulletproof vest under his jacket. He had long hair and a beard. McNett was assigned to the kitchen and to assist Detective Terry Parham with a battering ram.

4. Detective Terry Parham was also dressed in a sheriff's jacket and ballcap. He was assigned to the battering ram and to secure the southwest bedroom.

5. Detective Tony Gallegos, dressed in a sheriff's jacket and ballcap, was to follow Parham and secure the north room of the residence, which was a remodeled garage.

6. Bardezbain, wearing a suit with a sheriff's jacket and ballcap, was to follow Gallegos. He was assigned to help in any problem areas and to supervise the search.

7. Wichita police officer Steve Guthrey was in uniform and assigned to assist other officers as needed.

8. Lt. Norman Williams of the Wichita Police Department, also in uniform, was assigned to assist other officers.

9. Derby police officer Steve Crow was assigned to cover the area in the back of the house.

10. Wichita police officer Anthony Hill, also in uniform, was assigned to work with officer Crow covering the area in back of the house.

11. Sedgwick County sheriff's officer Rich Fessler was stationed outside the residence with officer Tommy Cribbs.

12. Sedgwick County sheriff's officer Tommy Cribbs, along with officer Fessler, constituted the Emergency Response Team and was assigned to wait outside the residence in the street.

At the time the search party approached the house, the living room was dark with the curtains drawn. The television provided the only light in the living room. Officer McNutt had difficulty opening the screen door and in the process made some noise. Just as Officer McNutt was able to get the screen door opened, a black man opened the inner door. The officers then entered the residence yelling "sheriff's officers," "sheriff's officer, search warrant," "sheriff's office, no one move," "Sedgwick County officers, sheriff's detectives, hands up," and other similar identifying phrases.

Despite these shouts, some occupants of the house did not know the men entering were police officers. For example, Evelean Wesley was in the southeast bedroom with her sister. Neither woman heard the intruders identify themselves as police officers but assumed they were police because the men carried guns and were white. Mae Morris also later testified that she did not know the white undercover policeman who entered the southwest bedroom was a police officer until later. In addition, Tyler testified he did not hear shouts identifying the officers. The residents had heard a rumor that the house was going to be robbed by Peewee Gates and, therefore, initially thought the intruders were robbers, not policemen.

Upon entering the house, Officer McNutt ordered a black male to stand up against the wall. Detective Woods ran down the hallway and kicked open the door to the southeast bedroom. Sergeant Bardezbain had a shotgun which he pumped to instill fear in the residents. Pursuant to his assignment, Detective McNett ran to the kitchen with his .38 Smith and Wesson drawn. Upon seeing McNett with his gun drawn, Tyler claimed he thought McNett was a robber and shot McNett with a .357 Magnum.

Tyler then stepped to the door of the kitchen and fired his gun just to let others in the house know he had a gun. Bardezbain saw Tyler point his revolver at him; Bardezbain turned to shoot but tripped and fell over a planter before Tyler fired his gun.

Detective Parham had been in the house only a few seconds when he heard the gunshots. Detective Parham, who had started toward the southwest bedroom, ran back to the living room. Parham shot twice at Tyler, who fell to the kitchen floor. Parham saw McNett lying on the kitchen floor and did not realize immediately that it was another officer. After shooting Tyler, Parham entered the kitchen and found McNett on the floor, shot through the eye. He had little or no pulse. McNett later died from the wound. By this time, Tyler had crawled behind the refrigerator and yelled, "Don't shoot." Tyler had been shot twice in the legs and dropped his gun on top of the refrigerator as he slid to the floor. Sonya Wheeler was also found in the kitchen. Sonya had had a gun, a .38 Smith and Wesson revolver, which was found underneath Tyler.

The people found in the residence were arrested, and a second warrant to search the house for evidence in connection with the homicide was issued. The original search warrant as well as the second were executed about three hours later, 3:00 a.m., February 23, 1988. The search revealed cocaine, drug paraphernalia, and other evidence. A third warrant was issued to search Tyler's Lincoln Meadows apartment, which he shared with Pamela Tafoya.

When he was arrested, Tyler had an Illinois driver's license identifying him as "Gregory I. Peoples." Thus, Tyler was originally charged under the name of Gregory I. Peoples. That information charged Tyler with five counts. The information was

later amended, correcting Tyler's name and charging him with nine counts. Prior to trial, Tyler pled guilty to conspiracy to sell cocaine. By his plea, Tyler admitted operating three crack houses in Wichita, including the one at 2432 N. Piatt.

On January 4, 1989, Tyler's jury trial on the remaining counts commenced. At trial, Wheeler testified that she worked for Tyler, a/k/a Mr. T, selling drugs at the house on Piatt. According to Wheeler, Tyler was the number one person; Pamela Tafoya, a/k/a Mrs. T, a/k/a Tracy Peoples, was the number two person; and Pamela Tafoya's son, John Tafoya, was the number three person in a drug distribution operation.

Wheeler testified that on the night of the raid she, Tyler, and Payne were sitting in the living room when she heard a commotion at the door. As the police entered, shouting "police," Wheeler and Tyler ran into the kitchen. Richard Polite also testified at trial that Wheeler and Tyler were sitting in the living room as the police entered, and that Wheeler possessed a .38 caliber weapon.

In the kitchen, according to Wheeler, she tried to throw the .38 into the trash but missed. She also threw some drugs on the floor. According to Wheeler, Tyler slipped and fell as he entered the kitchen. As he got up, Tyler was trying to pull his gun out of his pocket. As Tyler got his gun out of his pocket, McNett appeared and Tyler shot him. McNett was only a foot or two away from Wheeler when he was shot, and Tyler was standing right behind her. Although Wheeler had heard the rumor about a plan to rob the residence, she knew the people entering the house were police officers because she had heard them identify themselves.

Wheeler gave five different statements to the police prior to her testimony at trial. At least some of her prior statements indicate Wheeler did not know the intruders were policemen. These statements contain numerous inconsistencies, and at trial, Wheeler admitted to having lied to protect herself and Tyler. On July 22, 1988, the State charged Wheeler with the first-degree murder of Terry McNett. A few days later, Wheeler gave her final statement to the police, which was consistent with her trial testimony. Two days later, the State dismissed the charge of first-degree murder as well as two counts of aggravated assault of a

law enforcement officer. Wheeler pled guilty to conspiracy and possession with intent to sell. In the plea agreement, the State agreed to recommend the minimum sentence for those two crimes, with the possibility of probation and drug treatment. At trial, Wheeler denied the agreement required her to testify against Tyler; however, her sentencing was deferred until after Tyler's trial.

At trial, Tyler testified he and Wheeler were in the kitchen when the police entered the house. Wheeler was giving Tyler some money, proceeds from drug sales, and Tyler was putting the money in his billfold when he heard a commotion in the living room. He testified he did not know the intruders were policemen. First, he heard a loud noise, which he took to be a gunshot. He testified he presumed this noise was Woods kicking in the bedroom door. Next, he heard the sound of Bardezbain pumping his shotgun. Tyler believed robbers had entered the house and were killing people. Therefore, when he saw Detective McNett's face and his gun, Tyler claims he thought McNett was going to kill him, which prompted his shooting McNett.

The only other witness for the defense was Emery Goad, a former special agent for the Attorney General's Office from 1970 to 1974. Goad gave his expert opinion on the proper procedures for executing a search warrant. He testified that he would knock, announce the presence of police, preferably by bull horn, and wait for someone to open the door. Any effect in delaying entry would be offset by turning the water off at the residence prior to entry, so the drugs could not be flushed.

The trial court refused Tyler's request for a jury instruction on self-defense. The jury found Tyler guilty of all charges against him except one count of aggravated assault of a law enforcement officer, Detective Parham. The trial court invoked the Habitual Criminal Act and ordered maximum sentences be served for each count and for the sentences to run consecutively. Hence, Tyler's controlling sentence is 111 to 330 years. Tyler's motion to modify the sentences was denied by the trial court.

Other facts will be developed as needed in the discussion of issues.

I

Tyler's first issue on appeal is a multiple objection to the jury instructions. Tyler initially argues the trial court erred in refusing to instruct the jury on self-defense.

The right to self-defense is codified at K.S.A. 21-3211, which states: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

Tyler contends substantial evidence was presented to support his self-defense claim. For example, Tyler testified that he did not know Detective McNett or the other intruders were policemen, nor did he see any identifying clothing or badges when he shot McNett. Furthermore, other residents testified they did not hear "police" or "sheriff's officers" being shouted. Tyler, Wheeler, and other residents testified that they had heard rumors that the house was going to be robbed. Tyler also points out Detective McNett had long hair, a beard, and was wearing jeans and sneakers.

In *State v. Hill,* 242 Kan. 68, 744 P.2d 1228 (1987), when faced with the issue of whether the trial court should have given a self-defense instruction, we stated:

" '[I]n order to rely on self-defense as a defense, a person must have a belief that the force used was necessary to defend himself and, also, show the existence of some facts that support such a belief.' . . . It is the duty of the trial court to instruct the jury on self-defense so long as there is any evidence tending to establish self-defense, although the evidence may be slight and may consist solely of the defendant's own testimony." 242 Kan. at 78 (quoting *State v. Childers,* 222 Kan. 32, 48, 563 P.2d 999 [1977]).

The evidence a defendant must present, either through his own testimony or from other witnesses, to justify a self-defense instruction must include some evidence to support each prong of a two-prong self-defense test. The first prong is subjective and requires a showing that the defendant sincerely and honestly believed it necessary to kill to defend himself. The second prong is an objective standard and requires a showing that a reasonable person in the defendant's circumstances would have perceived self-defense as necessary. *State v. Stewart,* 243 Kan. 639, Syl. ¶ 5, 763 P.2d 572 (1988).

When refusing to give Tyler's self-defense instruction, the trial court stated:

"Reviewing all of the statutes in the area and looking at the intent of the legislature as set out in those statutes, I will this day rule that the aggression from which one may defend one's self or one's home must be an unlawful aggression before that is available as a defense for the reason to escape punishment for the commission of a crime and is, therefore, under this set of facts, not available to Mr. Tyler."

When ruling on Tyler's motion for new trial based upon the court's failure to instruct on self-defense, the trial court stated:

"It seems to me as to the issue of self-defense, under the facts of this case, if we were to analyze the law, what we would find is no evidence of aggression on the part of the sheriff's officer executing the search warrant, Terry McNett.

"The only evidence that would go toward the self-defense instruction or the requirement of the self-defense instruction would be that Mr. Tyler thought the law enforcement officer was an illegal aggressor.

"Lacking that element, there would be no requirement of an instruction going to self-defense."

Essentially, the trial court ruled a law enforcement officer executing a validly issued search warrant cannot be an "aggressor" within the meaning of K.S.A. 21-3211. The State contends the trial court's application of K.S.A. 21-3211 is proper and further argues the phrase "aggressor's imminent use of unlawful force" implies the imminent use of force is unlawful. We find the trial court's statement overbroad. Under circumstances where a person unidentifiable as a law enforcement officer uses force to execute a warrant where a reasonable person would believe the officer was an unlawful aggressor then force is justified to repel the aggressor. Under such circumstances, an instruction on self-defense is appropriate.

Such is not the case here. There is no indication McNett was about to use unlawful force. McNett was clearly identified as an officer. He was dressed in raid garb which identified him as a deputy Sedgwick County sheriff, the officers identified themselves as such when they entered the residence and this was heard by several individuals in the house, Tyler admitted hearing "something about get on the floor," Tyler did not attempt to ascertain McNett's identity, and Tyler admitted he knew his drug operation might be raided and knew the police might enter quickly in order

to execute a raid. Not only could no reasonable person believe McNett to be a rival gang member in the face of all the evidence, but also, no reasonable person would believe the defendant honestly believed it necessary to kill McNett to defend himself. Equally important, there was no showing that a reasonable person in Tyler's position would perceive self-defense as necessary. We find no error in refusing to instruct the jury on self-defense.

Next, Tyler argues the trial court erred by refusing to instruct on involuntary manslaughter. Tyler argues the killing of Detective McNett was committed in self-defense—a lawful act, in an unlawful or wanton manner, that is, by use of excessive force. Therefore, Tyler claims the trial court should have instructed the jury on involuntary manslaughter, K.S.A. 21-3404.

In light of our decision that Tyler was not entitled to a self-defense instruction, the trial court did not err in refusing to give an involuntary manslaughter instruction based on a self-defense theory. *State v. Jordan*, 250 Kan. 180, 189, 825 P.2d 157 (1992).

Tyler also contends jury instruction No. 24 was improper because it allowed the jury to convict him of sale of cocaine based upon his participation in the crime of conspiracy. Tyler argues the instruction was erroneous because it failed to limit the conspiracy evidence that the jury could consider when determining his guilt or innocence of the charge of sale of cocaine.

Jury instruction No. 24 provides:

"The law provides that a person who commits the crime of Conspiracy is criminally responsible for any substantive crime committed during the conspiracy by a coconspirator provided the substantive crime was committed pursuant to and within the scope of the unlawful agreement and its commission was reasonably foreseeable as a natural and probable consequence of the unlawful agreement.

"With regard to ST. JOHN TYLER'S responsibility, if any, for the substantive crime of Sale of Cocaine, if you find that PAMELA TAFOYA is guilty of the crime of Sale of Cocaine, you should consider whether ST. JOHN TYLER is also guilty of the crime of Sale of Cocaine because said Sale was committed pursuant to and within the scope of the Conspiracy and the commission of said Sale was reasonably foreseeable by him as a natural and probable consequence of the unlawful agreement.

"Since ST. JOHN TYLER has pled guilty to Conspiracy to Sell Cocaine, Crack and Heroin at 2432 North Piatt, you may find ST. JOHN TYLER guilty of Sale of Cocaine under this Instruction if you find beyond a reasonable doubt:

"1. That PAMELA TAFOYA sold a controlled substance known as cocaine;

"2. That PAMELA TAFOYA did so intentionally;

"3. That said Sale occurred on or about February 2, 1988 in Wichita, Sedgwick County, Kansas;

"4. That the said crime of Sale of Cocaine was committed pursuant to the said Conspiracy;

"5. That the said crime of Sale of Cocaine was committed within the scope of the said Conspiracy;

"6. That the commission of the said crime of Sale of Cocaine was reasonably foreseeable by ST. JOHN TYLER as a natural and probable consequence of said conspiracy;

"Under the conditions just defined, defendant ST. JOHN TYLER may be found guilty of the substantive crime of Sale of Cocaine even though he did not participate in the actual commission of the same."

Tyler cites to *State v. Collazo,* 1 Kan. App. 2d 654, 657, 574 P.2d 214 (1977), for his contention that a defendant must have participated in the sale of drugs to be criminally responsible. In that case, the Court of Appeals stated: "We conclude that the judge's instruction properly required the state to show only that the appellant participated in the sale, and that it was not necessary to show that she personally handled either the drug or the money." 1 Kan. App. 2d at 658. When taken in context, this statement does not contradict the longstanding rule of law that a conspirator can be held liable for substantive offenses committed by his coconspirators, if the offenses are committed during and in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 646-47, 90 L. Ed. 1489, 66 S. Ct. 1180, *reh. denied* 329 U.S. 818 (1946).

Tyler also cites *State v. Becknell,* 5 Kan. App. 2d 269, 615 P.2d 795 (1980). In *Becknell,* the trial court found the conspiracy had terminated prior to the offense in question; therefore, the Court of Appeals refused to hold the defendant criminally liable. 5 Kan. App. 2d at 275-76. Tyler claims *Becknell* is applicable because prior to trial, the trial court ruled that evidence of Tyler's out-of-state criminal activity was inadmissible. The trial court stated: "The only facts relevant to the issue of guilt would be those occurring after Defendants Tyler and Tafoya establish[ed] domicile in the State of Kansas. This is so because the conspiracy supporting all the crimes (except perjury, Count 9) charged here began after the Defendants Tyler and Tafoya were domiciled in Liberal or Wichita, Kansas during the middle of 1987."

The trial court here did not rule all conspiracy evidence inadmissible. It explicitly ruled that any conspiracy evidence supporting crimes charged and occurring after the middle of 1987 was admissible. This included evidence that the conspiracy existed to sell controlled substances at three locations, including 2432 N. Piatt, in Wichita. There was no finding the conspiracy terminated prior to the alleged sale of cocaine by Tafoya. Thus, *Becknell* does not support Tyler's argument.

Rather, *Becknell* is authority for holding vicarious liability in criminal conspiracies is applicable to a narcotics distribution conspiracy. In such cases, conspirators are held liable for any remote sale of drugs passing through the conspiracy so long as it is within the scope of, or is a reasonably foreseeable consequence of, the unlawful agreement. 5 Kan. App. 2d at 275 (citing *United States v. Decker*, 543 F.2d 1102 [5th Cir. 1976], *reh. denied* 525 F.2d 1298, *cert. denied* 431 U.S. 906 [1977]).

Jury instruction No. 24 refers to a conspiracy to sell cocaine, crack, and heroin at 2432 N. Piatt. The instruction directed the jury to find Tyler guilty of the sale of cocaine only if the jury found Tafoya guilty of the sale and that the sale was within the scope of the conspiracy to which Tyler had pled guilty.

We find no error in the giving of jury instruction No. 24.

## II

For his next issue Tyler claims the trial court erred in admitting the testimony of John Tafoya and Sonya Wheeler concerning statements Tyler made in response to a dream he had.

John Tafoya testified at a preliminary hearing that in July 1987 Tyler had described a dream to him in which a Colorado detective almost captured him. At that time, Tyler had said if the Colorado detective, Pat Crouch, came to get him, "they would have to shoot him and he would take someone out with him." The State proffered this evidence to prove Tyler's premeditation to kill and his intent to assault. Prior to trial, Tyler moved to exclude the testimony of Tafoya with regard to the dream. The trial court denied the motion.

At trial, Wheeler first testified that on or about January 16, 1988, Tyler told her that if the police attempted to arrest him, "He would take someone out." Wheeler further testified Tyler

had said this more than once. Mozell Jordan, however, testified she was with Tyler and Wheeler on January 16, 1988, and she did not recall Tyler making any such statement.

Later, John Tafoya was allowed to testify about Tyler's dream. After describing the dream, Tafoya quoted Tyler as having said that when the police come to get him, they would have to shoot him or he would take someone out with him. The dream and subsequent conversation between Tyler and Tafoya occurred in July 1987, probably while in the St. Louis area, before Tyler had moved to Kansas. Tafoya admitted he agreed to testify against Tyler because he wanted to get out of jail. After he offered to testify, the State entered into a plea agreement with Tafoya and he was placed on a work-release program.

When Tyler testified at trial, he stated he had not had a dream about Detective Crouch and further denied ever telling Tafoya about a dream. Tyler testified that he advised his associates to cooperate with the police and not resist arrest. Several witnesses corroborated this statement.

Tyler makes several arguments in support of his claim that admission of Tafoya's and Wheeler's testimony constitutes reversible error. First, he claims the statement made to Tafoya referred to a Colorado narcotics detective, or at most the Colorado Springs police department. It was not directed toward a generic class of people to which the decedent belonged and, therefore, it was irrelevant to the issue of premeditation and intent. Next, assuming Detective McNett was a member of the class to which the threat was directed, the threat was made in response to a dream and, thus, it was unreliable and had little probative value as to Tyler's state of mind at the time of the shooting several months later. Tyler argues the evidence was too remote in time to the night of the raid. Finally, Tyler contends Wheeler's testimony was irrelevant and unreliable and had no probative value.

If a prior threat was made against a deceased victim, that evidence is properly admitted to show intent and motive. *State v. Anicker,* 217 Kan. 314, 316, 536 P.3d 1355 (1975). "If the threat was against a class of persons to which deceased belonged, it would be admissible on the question of defendant's actions. [Citation omitted.] In addition, the threat might be admissible because of the relationship between defendant and deceased un-

der the circumstances of the case." *State v. Garcia,* 83 N.M. 51, 52, 487 P.2d 1355 (Ct. App. 1971). In *Garcia,* the defendant made the following threat: " 'If you or any narco ever stop me and I am loaded, you had better be prepared to shoot it out because I will kill you.' " 83 N.M. at 52. The defendant subsequently killed a sheriff's sergeant. The New Mexico Court of Appeals held the trial court erred in admitting the threat because the defendant did not make a specific threat against the deceased sergeant; the sergeant, who was not a narcotics agent, was not a member of the class threatened; and the threat could not be interpreted as a threat against all police officers.

In *People v. Rodriguez,* 42 Cal. 3d 730, 230 Cal. Rptr. 667, 726 P.2d 113 (1986), the defendant told several people he would kill any law enforcement officer who attempted to arrest him. Later, the defendant killed two highway patrol officers. The California Supreme Court held that testimony of the defendant's threats was properly admitted and stated: "The statements here in question did not specify a victim or victims but were aimed at any police officer who would attempt to arrest appellant. Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat." 42 Cal. 3d at 757.

In the case before us, the State argues any circumstances, such as the statements being made in response to a dream, are matters for the jury to consider when weighing the evidence. *State v. Pondexter,* 234 Kan. 208, 215, 671 P.2d 539 (1983). The State further contends that determining whether evidence is too remote to be admissible rests within the sound discretion of the trial court. Mere lapse of time alone is not sufficient to deprive evidence of its probative value, but goes to the weight of the evidence to be considered by the jury. *State v. Fenton,* 228 Kan. 658, 620 P.2d 813 (1980). The State also points out that this court has upheld the admission of threats made seven and nine months prior to the actual murder. See *Fenton,* 228 Kan. at 667-68.

We hold Wheeler's testimony was properly admitted. Wheeler testified that Tyler made the statement that he would "take someone out" only a few weeks before he killed Detective McNett. This threat was generic, toward law enforcement officers as a group, and Detective McNett was a member of that group. We,

however, hold it improper to admit the testimony of John Tafoya. It is an abuse of discretion to admit evidence of a defendant's sleep-induced dream to prove his state of mind. Such evidence is too speculative to be reliable. Although Tyler's statement to Tafoya was not a part of the actual dream, it was so closely related to the dream that it also lacks probative value.

Having determined that admission of Tafoya's testimony was error, we must now determine whether it was harmless error. "For trial error to be harmless, an appellate court must be able to declare beyond a reasonable doubt that the error did not change the outcome of the trial." *State v. Crispin*, 234 Kan. 104, 114, 671 P.2d 502 (1983). The jury did not find Tyler guilty of first-degree premeditated murder and found him guilty of only one of the two counts of assault of a law enforcement officer. In light of this, coupled with the fact that Wheeler's testimony was properly admitted, we conclude admission of Tafoya's testimony was harmless error in that it would not have changed the outcome of the trial had it not been admitted.

Next, Tyler contends the trial court improperly admitted evidence which it had previously ruled was inadmissible. Tyler's attorney filed several motions in limine to exclude evidence of Tyler's prior illegal conduct in other states. In ruling on these motions, the trial court stated: "The only facts relevant to the issue of guilt would be those occurring after Defendants Tyler and Tafoya establish[ed] domicile in the State of Kansas. This is so because the conspiracy supporting all the crimes, (except perjury, Count 9) charged here began after the Defendants Tyler and Tafoya were domiciled in Liberal or Wichita, Kansas during the middle of 1987."

Tyler's attorney also moved to exclude evidence of drug activities occurring in various houses in Wichita because Tyler had pled guilty to conspiracy prior to trial. When ruling on that motion, the trial court held that evidence bearing on the conspiracy to which Tyler had pled would be allowed. The trial court further stated: "If the evidence is proffered for some other element in the crime subject to foundation and subject to not getting cumulative, I will allow the evidence and I don't know how I can rule on each individual piece of evidence until the same is proffered and then objection is made or not made."

At trial, testimony was admitted as to the following: John Tafoya and Tyler drove to California in December 1988 to buy cocaine and heroin; a crack house on Primrose Street in Wichita, operated by Tyler and other defendants, had been raided prior to the Piatt Street raid; John Tafoya had seen crack, cocaine, and heroin prepared by Pamela Tafoya and Tyler in their apartment in Wichita; and Tyler testified on cross-examination that he had been selling "dope" since 1985, had done so in several states, and ran other crack houses in Wichita other than the one on Piatt street.

Tyler argues the admission of this evidence relieved the State of its burden of proof on the counts of sale and possession with intent to sell cocaine and also prejudiced the jury against him as generally being a bad person. Much of Tyler's argument is based upon his contention that because he pled to conspiracy, no conspiracy evidence could be introduced at trial. Tyler claims "the trial court's memorandum opinion and later rulings make clear that the conspiracy ended prior to the incident on N. Piatt Street." The record does not support this statement.

Tyler's argument overlooks the fact the jury still had to find Pamela Tafoya was a member of the conspiracy in order to find Tyler guilty based upon conspiratorial liability. Furthermore, other portions of the challenged evidence also bore on the charges of possession of cocaine and heroin with the intent to sell.

Tyler also contends the evidence should not have been admitted because it was admitted in violation of K.S.A. 60-455 and no limiting instruction was given. Evidence of other crimes and wrongdoing is inadmissible pursuant to K.S.A. 60-455 except to prove motive, opportunity, intent, plan, knowledge, identity, or absence of mistake or accident. The complained-of evidence was admitted under the exceptions to K.S.A. 60-455. Tyler's objection is without merit.

### III

Tyler argues the officers used excessive force when executing the search warrant in violation of the Fourth Amendment and § 15 of the Kansas Bill of Rights, thereby requiring suppression of all evidence seized from the residence at 2432 N. Piatt. Tyler contends the officers should have announced their presence, authority, and purpose prior to entering the residence. Much of

Tyler's argument is based upon *Sabbath v. United States*, 391 U.S. 585, 20 L. Ed. 2d 828, 88 S. Ct. 1755 (1968). In *Sabbath*, United States customs agents entered the defendant's apartment by opening the closed but unlocked door. The customs agents were subject to 18 U.S.C. § 3109 (1988), which provided in part that an officer could break into a house to execute a search warrant "if, after notice of his authority and purpose, he is refused admittance." The Court found the custom agents' entrance violated § 3109 and that no exception to the statute was justified by the evidence.

Although searches must be reasonable, as required by the Fourth Amendment and § 15 of the Kansas Bill of Rights, 18 U.S.C. § 3109 does not apply to the states. In Kansas, K.S.A. 22-2508 governs, which provides: "All necessary and reasonable force may be used to effect an entry into any building or property or part thereof to execute a search warrant." Kansas has not adopted a knock and announce rule.

In *Ker v. California*, 374 U.S. 23, 34, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963), the Court announced that states could develop their own rules governing search and seizure as long as those rules follow the constitutional prohibition against unreasonable searches and seizures. In that case, a law enforcement officer failed to knock and announce because he believed that Ker possessed narcotics that could easily be destroyed and the officer had observed behavior leading him to believe Ker was expecting him. The Court found the officer's conduct was reasonable under the circumstances and did not violate the Fourth Amendment. 374 U.S. at 40-41.

Now let us examine the evidence in this case to determine whether the manner in which the officers entered the residence was reasonable. Tyler points out only one officer entering the front door was dressed in uniform. All other officers, however, were wearing raid jackets with a cloth sheriff's badge on the front and "SHERIFF'S NARCOTICS" on the back as well as hats with sheriff's badges on the front. A bullhorn was not used to announce their presence, but the officers identified themselves and their purpose as they entered. The officers knew a bodyguard, who carried a hammer, would be at the front door and that another

person known as "Big Man" had been observed at the house and was known to carry a gun.

Law enforcement officers, especially in narcotics cases, must weigh several factors when deciding how to execute a search warrant. For example, delay could possibly lead to the destruction of evidence and increase the danger to the officers. In this case, based upon the information available to the police prior to the execution of the search warrant, we find the search was reasonable. Therefore, the trial court did not err in admitting the evidence seized.

## IV

Tyler contends there was not sufficient evidence to convict him of the sale of cocaine. Specifically, Tyler contends there was no evidence he was present at 2432 N. Piatt when Pamela Tafoya sold cocaine to Bobo, no evidence that he was an active participant in the sale, no evidence that he negotiated or set up the sale, and no evidence of his intent to sell cocaine to Bobo.

The scope of this court's review is well established. We have stated: "When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Dunn,* 249 Kan. 488, Syl. ¶ 1, 820 P.2d 412 (1991).

Although there is no evidence Tyler was present when Bobo purchased cocaine from Pamela Tafoya, there was credible evidence admitted that he was both an aider and abettor and a coconspirator in the sale of cocaine by Tafoya. The trial court instructed on both these theories. We have already discussed instruction No. 24, which instructed the jury upon conspiratorial liability. Vicarious liability based upon aiding and abetting is codified at K.S.A 21-3205(1), which states: "A person is criminally responsible for a crime committed by another if he intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime."

A defendant does not have to be present during the commission of a crime to be convicted as an aider and abettor if he otherwise

intentionally furthers the success of the venture. *State v. Burton*, 235 Kan. 472, 478, 681 P.2d 646 (1984). A conspirator can be held vicariously liable for the substantive offenses of his coconspirators which are committed during and in furtherance of the conspiracy. *State v. Becknell*, 5 Kan. App. 2d 269, 275, 615 P.2d 795 (1980).

In the case before us, Tyler entered into an agreement with Debra Potts to use her rented house at 2432 N. Piatt to sell drugs. Tyler went to California and purchased 2 kilos of cocaine, which were later packaged for sale and then taken to 2432 N. Piatt as needed. Pamela Tafoya contacted Tyler when she needed to refill the drug supply at the Piatt residence. Furthermore, Tyler admitted he ran the drug-selling operation at 2432 N. Piatt. Tafoya and Tyler shared an apartment at Lincoln Meadows where Tyler kept drugs until they were needed for sales at 2432 N. Piatt. After his arrest, Tyler gave the authorities a false name. He later testified he lied about his name in order to give Tafoya "enough time to do whatever she wanted to do before I told the police or whoever, the judge or whoever, my real name."

The record reveals ample evidence upon which the jury could find, beyond a reasonable doubt, Tyler guilty of the sale of cocaine based upon either conspiratorial liability or as an aider and abettor.

## V

Tyler contends the convictions for sale of cocaine and possession of cocaine with intent to sell are multiplicitous.

We have stated:

"Multiplicity exists when the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other. Charges are not multiplicitous when the offenses occur at different times and in different places.

"A test for determining whether a continuous transaction results in the commission of but a single offense is whether separate and distinct prohibited acts, made punishable by law, have been committed. A single motive for a series of acts does not necessarily result in a single crime." *State v. Woods*, 250 Kan. 109, Syl. ¶¶ 6, 7, 825 P.2d 514 (1992).

Tyler again cites *Becknell* for support. In *Becknell*, the defendant was convicted of two counts of possession and two counts of sale of a controlled substance, LSD. Twice the defendant had

bought a quantity of LSD and then given it to his coconspirator, who sold it. Because the two counts of possession were based upon the possession of the same drugs involved in the sale transactions, the Court of Appeals held the possession convictions merged with the sale convictions. 5 Kan. App. 2d at 275. *Becknell* is easily distinguishable on the facts.

*State v. Roudybush,* 235 Kan. 834, 686 P.2d 100 (1984), is on point. In *Roudybush,* an individual working with the Wamego Police Department made a controlled buy of marijuana at the defendant's house. Based upon this buy, law enforcement officers obtained a warrant to search the defendant's residence. The search revealed a large quantity of marijuana, and the defendant was charged with and convicted of both sale of marijuana and possession of marijuana with intent to sell. On appeal, the defendant argued his convictions were multiplicitous. We held the two offenses did not merge because the defendant's sale of one ounce of marijuana on one day is not the same offense as his continued possession of the remaining inventory found the following day. Each offense required proof of a fact not required in proving the other and, therefore, the two charges were not multiplicitous. 235 Kan. at 850.

In the case before us, Tyler admits his conviction for sale of cocaine was based upon the sale to Bobo on the evening of February 2, 1988. Following that sale, Tyler admits bringing more cocaine to 2432 N. Piatt from his apartment at Lincoln Meadows. When law enforcement officers executed the search warrant based upon Bobo's controlled buy, cocaine packaged for sale was found. Thus, Tyler's convictions for sale of cocaine and possession of cocaine with intent to sell involve different quantities of the drug and are not multiplicitous.

## VI

Tyler contends the offense of conspiracy merges with the offenses of sale, possession with intent to sell, assault, and murder. In essence, Tyler claims that because his conviction for conspiracy was based upon the same behavior as the substantive offenses for which he was convicted, his offenses merge. Tyler points out K.S.A. 21-3107(2)(d) prohibits a defendant from being convicted of a crime and its included crime, that being "a crime necessarily

proved if the crime charged were proved." For support Tyler cites *State v. Fike,* 243 Kan. 365, 757 P.2d 724 (1988), which discussed the two-prong test used to determine whether a lesser crime is a lesser included offense. Tyler's argument makes several references to the overt acts for his conspiracy conviction identified in the fourth amended information.

Tyler pled to conspiracy as alleged, in part, in the first amended information. His plea was based upon three overt acts, those being profitably operating three identified crack houses in Wichita, including 2432 N. Piatt. In *Pinkerton v. United States,* 328 U.S. 640, 643, 90 L. Ed. 1489, 66 S. Ct. 1180, *reh. denied* 329 U.S. 818 (1946), the United States Supreme Court stated: "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established." Tyler's argument is without merit.

## VII

Tyler contends the trial court erred in refusing to remove a memorial plaque to the victim from the first floor lobby of the courthouse. In the lobby of the Sedgwick County Courthouse, there is a bronze plaque dedicated to McNett, who was shot by Tyler. The plaque measures 16 by 18 inches and has the following inscription: "Terry McNett . . . was killed in the line of duty on February 3, 1988, while participating in a criminal investigation which involved the execution of a search warrant for illegal narcotics and dangerous drugs."

Prior to trial, Tyler filed a motion to remove or cover the plaque during trial. He argued the jurors would read the plaque and be so prejudiced that he would be denied a trial by an impartial jury, in violation of § 10 of the Kansas Constitution Bill of Rights. The trial court denied Tyler's motion for two reasons: First, the jury would take an oath to try the case conscientiously and return a verdict according to the law and the evidence and, second, the jury would be instructed to base its verdict upon evidence admitted during trial.

Juries are presumed to have followed the instructions given by the trial court. *State v. Logan,* 236 Kan. 79, 84, 689 P.2d 778

(1984). On appeal, the defendant bears the burden of proving he was prejudiced by the plaque, and thereby denied a fair trial. See *State v. McNaught,* 238 Kan. 567, 580, 713 P.2d 457 (1986). In the case at hand, the record contains no affidavit or testimony of any person or juror which indicates prejudice. This issue is without merit.

## VIII

Next, Tyler claims the trial court erred in refusing to poll the jury regarding a television news story that was allegedly prejudicial to Tyler. Prior to the jury's deliberations, Tyler's attorney requested the trial court poll the jury concerning a television news report aired the previous evening at 6:00 p.m., February 1, 1989. Tyler's attorney stated he had heard secondhand that a local television station had aired a "blatantly prejudicial segment of some length" concerning Tyler having killed McNett. When making this motion, defense counsel admitted the court had been reminding the jury not to read anything or listen to anything about the case. The trial court denied Tyler's motion.

On appeal, Tyler contends "[t]he trial court's refusal to even question the jury was clear error."

In *State v. Zimmerman,* 251 Kan. 54, Syl. ¶¶ 10, 11, 833 P.2d 925 (1992), we stated:

"A motion to inquire during trial is not a proper method to determine if members of a jury are aware of prejudicial articles published or aired during the trial."

"In an appeal from a trial court's denial of a criminal defendant's motion for a new trial based on prejudicial media publicity about the defendant during the trial, if the record on appeal fails to show that a single member of the jury was made aware of the complained-of publicity and if this publicity was not massive, persuasive, or disruptive of the trial proceedings, there is no trial error because the defendant has failed to prove he was deprived of a fair trial."

In the case before us, the complained-of television news story has not been provided in the record and, therefore, it is impossible to determine its potential prejudicial effect. Tyler neither requested the polling of the jury after the verdict nor subpoenaed the jurors for the hearing on the motion for a new trial to show knowledge of the television news story. Thus, there is no basis upon which to find prejudice.

We find Tyler has failed to meet his burden of proving the television news story had any effect upon the jury's verdict. Thus, we hold the trial court did not err in denying Tyler's request to poll the jury.

## IX

Tyler further argues the statements he made at his first appearance could not be the basis for a charge of perjury.

When Tyler was arrested, he had in his wallet an Illinois driver's license identifying him as Gregory I. Peoples. On February 4, 1988, an information was filed charging Gregory I. Peoples with several offenses. On the same day, a first appearance was held before the Honorable Keith Sanborn. At the hearing, Tyler's affidavit seeking court-appointed counsel bore Peoples' name and signature. When reviewing the affidavit, Judge Sanborn stated: "It's an offense if you misstate the truth on this Affidavit . . . ." The judge then administered an oath to the person identifying himself as Gregory I. Peoples, who then swore the affidavit was accurate. The court appointed counsel for Peoples (Tyler) and announced that a hearing regarding the question of bail would be scheduled for a later date.

The bail hearing was held on February 9, 1988. At that time, the defendant admitted his name was St. John Tyler. In response, Judge Sanborn stated: "As I advised you, sir, at the last hearing, a criminal offense is involved in misrepresentations to the court." Ultimately, Tyler was held without bail.

On February 19, 1988, Tyler was charged in an amended information with perjury in connection with the false statements he made on February 4, 1988. Prior to trial, Tyler moved to dismiss the perjury charge or, in the alternative, suppress the statements made by him on February 4, 1988. This motion was denied. At trial, Tyler testified he did not give his correct name upon arrest because he wanted to give Pamela Tafoya "enough time to do whatever she wanted to do."

Perjury is defined by K.S.A. 1991 Supp. 21-3805(a) as willfully, knowingly and falsely swearing, testifying, affirming, declaring or subscribing to any material fact upon any oath or affirmation legally administered in any cause, matter or proceeding before

any court, tribunal, public body, notary public or other officer authorized to administer oaths."

Tyler contends the affidavit for court-appointed counsel is used in determining bond. K.S.A. 1991 Supp. 22-2802 provides in part:

"(1) Any person charged with a crime shall, at the person's first appearance before a magistrate, be ordered released pending preliminary examination or trial upon the execution of an appearance bond in an amount specified by the magistrate and sufficient to assure the appearance of such person before the magistrate when ordered and to assure the public safety. . . .

. . . .

"(9) Statements or information offered in determining the conditions of release need not conform to the rules of evidence. No statement or admission of the defendant made at such a proceeding shall be received as evidence in any subsequent proceeding against the defendant."

Because K.S.A. 1991 Supp. 22-2802(9) provides that a defendant's statement or admission at a first appearance cannot be used as evidence in a subsequent proceeding against the defendant, Tyler argues the fact that he represented himself as Gregory I. Peoples on February 4, 1988, cannot be used to convict him of perjury.

The State argues K.S.A. 22-4504, which governs the appointment of counsel to indigent defendants, is also pertinent. K.S.A. 22-4504 provides in part:

"(a) When any defendant who is entitled to have the assistance of counsel, under the provisions of K.S.A. 22-4503 and amendments thereto, claims to be financially unable to employ counsel, the court shall require that the defendant file an affidavit containing such information and in the form as prescribed by rules and regulations adopted by the state board of indigents' defense services. The court may interrogate the defendant under oath concerning the contents of the affidavit and may direct the county or district attorney, sheriff, marshal or other officer of the county to investigate and report upon the financial condition of the defendant and may also require the production of evidence upon the issue of the defendant's financial inability to employ counsel.

"(b) Upon the basis of the defendant's affidavit, the defendant's statements under oath, and such other competent evidence as may be brought to the attention of the court, which shall be made a part of the record in the case, the court shall determine whether the defendant is financially unable to employ counsel."

The rules of statutory construction are well settled. The court is required to strictly construe penal statutes in favor of the accused. This rule of strict construction, however, is subordinate

to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. *State v. Magness,* 240 Kan. 719, 721, 732 P.2d 747 (1987).

The State argues the affidavit was used only for determining whether to appoint counsel for Tyler and, therefore, K.S.A. 1991 Supp. 22-2802(9) is not applicable. Furthermore, K.S.A. 22-2802 does not require a defendant to take an oath at a bond hearing. In contrast, K.S.A. 22-4504(a) specifically requires a defendant seeking court-appointed counsel to complete an affidavit and allows the court to interrogate a defendant under oath concerning the contents of that affidavit.

We agree with the State's argument. If false statements made in an affidavit for court-appointed counsel cannot serve as a basis for a perjury conviction, then the legislative intent of K.S.A. 22-4504(a) is undermined.

## X

Tyler argues he was not properly charged with the crimes of which he was convicted. The final information filed in this case, the third amended information, alleged only the crime of conspiracy; therefore, Tyler contends his other convictions must be set aside.

On February 4, 1988, the State filed an initial information charging five counts: first-degree murder, two counts of aggravated assault of a law enforcement officer, possession of heroin with intent to sell, and possession of cocaine with intent to sell. On February 19, 1988, an amended information was filed charging all nine counts. The counts added were: conspiracy, sale of cocaine, perjury, and an alternative charge of felony murder. On July 22, 1988, an amended information entitled "First Amended Information" was filed, again charging nine counts. A second amended information was prepared but never filed. The original information charged Gregory I. Peoples. The amended information listed nine defendants, including St. John Tyler. The first amended information lists the same nine people, including St. John Tyler. A third amended information was filed on February 6, 1989, during the jury's deliberations. The third amended information listed the same nine defendants, but charged only the crime of conspiracy. Pamela Tafoya's name is underlined in the

caption of that information. On the same day, Pamela Tafoya entered a plea to several counts, including conspiracy as alleged in the third amended information. Finally, a fourth amended information was filed on March 7, 1989, naming only Rudolph O. Hudson as a defendant. That information also only charges the count of conspiracy.

In *State v. Jackson*, 239 Kan. 463, Syl. ¶¶ 1, 2, 5, 721 P.2d 232 (1986), we stated:

"In a felony action, the indictment or information is the jurisdictional instrument upon which the accused stands trial."

"A conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void. Failure of an information to sufficiently state an offense is a fundamental defect which can be raised at any time, even on appeal."

"An information which omits one or more of the essential elements of the crimes it attempts to charge is jurisdictionally and fatally defective, and convictions for those offenses must be reversed."

The State may orally amend an information and file a subsequent journal entry curing the insufficiency of the information. *State v. Rasch*, 243 Kan. 495, 500, 758 P.2d 214 (1988). Pursuant to K.S.A. 22-3201(2) and (4), an information is required to be in writing, and may be amended at any time with leave of the court before a verdict or finding "if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced."

Tyler argues the third amended information governs his convictions because it was filed prior to the jury reaching a verdict. The third amended information did not incorporate by reference the previously filed information. The third amended information charges only the crime of conspiracy and lists Tyler as a defendant. Tyler, however, pled guilty to conspiracy prior to trial.

This issue is being raised for the first time on appeal. Tyler points out that our decision in *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990), does not apply to this case. In *Hall*, we announced that when an information is claimed, for the first time on appeal, to be defective, common sense would be the guide for determining whether the information was sufficient. Essentially, the defendant must prove the defect in the information has prejudiced the defendant's defense, impaired the defendant's

ability to plead the conviction, or limited the defendant's substantial rights to a fair trial. *Hall,* 246 Kan. 728, Syl. ¶ 12. These new rules set forth in *Hall,* however, apply prospectively to complaints or informations filed after the date of the opinion, May 31, 1990.

After pleading guilty to conspiracy, count one of the first amended information, Tyler's trial on the remaining counts set out in that information commenced on January 4, 1989. Throughout trial, Tyler's attorney referred to the first amended information as the charging document applicable to his client. On February 2, 1989, the court instructed the jury and counsel made their closing arguments. On February 6, 1989, the third amended information was filed. The jury rendered its verdict on February 8, 1989.

There is nothing in the record to indicate the charges against Tyler for which he was convicted by the jury were amended while the jury deliberated, nor that the jury was re-instructed on the single charge set out in the third amended information. This litany of filings is confusing, but we must bear in mind that the only real controversy pertains to the third amended information, which was filed during jury deliberations. That information charges only conspiracy, which Tyler had pled guilty to prior to trial. Thus, it is apparent the jury's verdict was not affected by the filing of the third amended information. We find no error.

## XI

Tyler's final issue challenges the sentence imposed, 111 to 330 years, as cruel and unusual punishment in violation of the Eighth Amendment and § 9 of the Kansas Bill of Rights.

Following Tyler's convictions, a presentence investigation report was prepared. Tyler lied about his family and employment history to the Court Services Officer (CSO) preparing the presentence investigation report. In the course of his interview, Tyler also told the CSO he had little respect for people who used drugs. Tyler further stated he sold drugs because "it was a business to him, nothing more, nothing less." Tyler's criminal history spans 28 years and includes felony and misdemeanor convictions, felony and misdemeanor arrests, and several outstanding criminal

charges. Many of Tyler's outstanding criminal charges are felony counts for the sale of cocaine in Colorado. The presentence investigation report recommended the maximum sentence on each count, with all sentences to run consecutively.

Prior to sentencing, the court granted the State's motion to impose the provisions of the Habitual Criminal Act, K.S.A. 1991 Supp. 21-4504(b), based upon Tyler's 1969 and 1971 convictions for violation of the Mann Act, interstate transportation of a woman for purposes of prostitution. Tyler served a total of five years in federal penitentiaries for these two prior felony convictions. The trial court considered the presentence investigation report and heard comments from Tyler, his attorney, and the State before it imposed sentence. The court then sentenced Tyler to a controlling term of 111 to 330 years.

Following sentencing, an SRDC report was prepared. At that time, Tyler stated "the only thing that interested him was selling dope to make money." Tyler also stated that because he was poor and had to work when he was young, he made the decision he would not work hard as an adult in order to make money. Tyler began making money illegally when he was 21 years old and his last reported employment was in 1978. The SRDC report revealed Tyler displayed a "careless indifference for the rights and welfare of others," he had a quick temper and poor impulse control, he viewed "conventional social rules as inapplicable to himself," he lied, he was shrewd and calculating, he displayed "an inability to consider the consequences of his behavior before he acts," and he demonstrated no evidence of remorse. The SRDC report recommended continued incarceration.

Tyler's attorney moved to modify Tyler's sentence. After taking the matter under advisement, the trial court denied the request to modify sentence. In its memorandum opinion, the trial court reviewed Tyler's personal history, criminal record, and the applicable statutes and case law. The trial court noted Tyler will not be eligible for parole until he is 105 years old.

First, Tyler contends the sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Tyler claims his sentence is disproportionate when compared to sentences for other crimes and cites *Solem v. Helm*, 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983). In *Solem*, the Court held a

sentence of life imprisonment without possibility of parole violated the Eighth Amendment because it was "significantly disproportionate" to the crime of uttering a "no account" check, his seventh nonviolent felony.

More recently, however, in *Harmelin v. Michigan,* 501 U.S. _____, 115 L. Ed. 2d 836, 846, 111 S. Ct. 2680 (1991), the United States Supreme Court stated: "We conclude . . . that *Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee." Furthermore, in *Harmelin,* the Court found a mandatory sentence of life in prison without the possibility of parole for possessing 672 grams of cocaine imposed on a first-time offender did not constitute cruel and unusual punishment.

Next, Tyler argues his sentence violates the cruel and unusual punishment prohibition found in § 9 of the Kansas Constitution Bill of Rights. When addressing this issue in *State v. Freeman,* 223 Kan. 362, 367, 574 P.2d 950 (1978), we stated:

"In determining whether the length of a sentence offends the constitutional prohibition against cruel punishment three techniques should be considered:

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense."

We have also recognized that the imposition of consecutive sentences does not per se constitute the imposition of cruel and unusual punishment. *In re MacLean,* 147 Kan. 678, Syl. ¶ 4, 78 P.2d 855 (1938). We have also held that a sentence imposed pursuant to the Habitual Criminal Act does not, in and of itself, constitute the imposition of cruel and unusual punishment. *State v. Coutcher,* 198 Kan. 282, 287-89, 424 P.2d 865 (1967). Tyler contends his prior convictions are too remote in time to be used to enhance his sentence. This court, however, in *Baker v. State,* 213 Kan. 874, 518 P.2d 537 (1974), sanctioned the use of a 31-year-old conviction to enhance the defendant's sentence.

Tyler claims the trial court abused its discretion by giving him such a long sentence, guaranteeing he will die in prison. We have stated: "The fact that the minimum sentence imposed by a trial court exceeds the life expectancy of the defendant has never been grounds, per se, for a finding that the sentence is oppressive or constitutes an abuse of discretion." *State v. Nunn*, 247 Kan. 576, 580, 802 P.2d 547 (1990).

After a review of the record and considering the nature of Tyler's offenses we find his sentence is not grossly disproportionate to his crimes in violation of § 9 of the Kansas Constitution Bill of Rights. The sentence imposed is within the limits proscribed by law and we find it is not a product of partiality or prejudice. Furthermore, the trial court did not abuse its discretion when sentencing Tyler to a controlling sentence of 111 to 330 years.

The judgment of the trial court is affirmed.