# LINDH *v.* MURPHY, WARDEN

No. 96–6298.   Argued April 14, 1997—Decided June 23, 1997

Souter, J., delivered the opinion of the Court, in which Stevens, O'Connor, Ginsburg, and Breyer, JJ., joined. Rehnquist, C. J., filed a dissenting opinion, in which Scalia, Kennedy, and Thomas, JJ., joined, *post*, p. 337.

*James S. Liebman* argued the cause for petitioner. With him on the briefs were *Richard C. Neuhoff* and *Keith A. Findley.*

*Sally L. Wellman,* Assistant Attorney General of Wisconsin, argued the cause for respondent. With her on the brief was *James E. Doyle,* Attorney General.*

JUSTICE SOUTER delivered the opinion of the Court.

The Antiterrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, signed into law on April 24, 1996, enacted the present 28 U. S. C. § 2254(d) (1994 ed., Supp. II). The issue in this case is whether that new section of the statute dealing with petitions for habeas corpus governs

---

*Judy Clarke* and *Lisa Kemler* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Jeffrey S. Sutton,* State Solicitor, and *Simon B. Karas* and *Jon C. Walden,* Assistant Attorneys General, *Christine O. Gregoire,* Attorney General of Washington, and *Paul D. Weisser* and *John J. Samson,* Assistant Attorneys General, *John M. Bailey,* Chief States Attorney of Connecticut, and *Gus F. Diaz,* Acting Attorney General of Guam, joined by the Attorneys General for their respective jurisdictions as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Jeffrey A. Modisett* of Indiana, *Carla J. Stovall* of Kansas, *A. B. Chandler III* of Kentucky, *Richard P. Ieyoub* of Louisiana, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Heidi Heitkamp* of North Dakota, *Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Jeffrey B. Pine* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *John Knox Walkup* of Tennessee, *Jan Graham* of Utah, *James B. Gilmore III* of Virginia, *Julio A. Brady* of the Virgin Islands, and *William U. Hill* of Wyoming; for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* and for the Washington Legal Foundation by *Daniel J. Popeo, Paul D. Kamenar,* and *Ronald D. Maines.*

applications in noncapital cases that were already pending when the Act was passed. We hold that it does not.

## I

Wisconsin tried Aaron Lindh on multiple charges of murder and attempted murder. In response to his insanity defense, the State called a psychiatrist who had spoken with Lindh immediately after the killings but had later, and before Lindh's trial, come under criminal investigation by the State for sexual exploitation of some of his patients. Although, at trial, Lindh tried to ask the psychiatrist about that investigation, hoping to suggest the witness's interest in currying favor with the State, the trial court barred the questioning. Lindh was convicted.

On direct appeal, Lindh claimed a violation of the Confrontation Clause of the National Constitution, but despite the denial of relief, Lindh sought neither review in this Court nor state collateral review. Instead, on July 9, 1992, he filed a habeas corpus application in the United States District Court, in which he again argued his Confrontation Clause claim. When relief was denied in October 1995, Lindh promptly appealed to the Seventh Circuit. Shortly after oral argument there, however, the federal habeas statute was amended, and the Seventh Circuit ordered Lindh's case be reheard en banc to see whether the new statute applied to Lindh and, if so, how his case should be treated.

The Court of Appeals held that the Act's amendments to chapter 153 of Title 28 generally did apply to cases pending on the date of enactment. 96 F. 3d 856, 863 (1996). Since the court did not read the statute as itself answering the questions whether or how the newly amended version of §2254(d) would apply to pending applications like Lindh's, id., at 861–863, it turned to this Court's recent decision in *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994). *Landgraf* held that, where a statute did not clearly mandate an application with retroactive effect, a court had to deter-

mine whether applying it as its terms ostensibly indicated would have genuinely retroactive effect; if so, the judicial presumption against retroactivity would bar its application. The Seventh Circuit concluded that applying the new § 2254(d) to cases already pending would not have genuinely retroactive effect because it would not attach "new legal consequences" to events preceding enactment, and the court held the statute applicable to Lindh's case.   96 F. 3d, at 863–867 (citing *Landgraf, supra,* at 270).   On the authority of the new statute, the court then denied relief on the merits.   96 F. 3d, at 868–877.

The Seventh Circuit's decision that the new version of § 2254(d) applies to pending, chapter 153 cases conflicts with the holdings of *Edens* v. *Hannigan,* 87 F. 3d 1109, 1112, n. 1 (CA10 1996), *Boria* v. *Keane,* 90 F. 3d 36, 37–38 (CA2 1996) *(per curiam),* and *Jeffries* v. *Wood,* 114 F. 3d 1484 (CA9 .1997).   In accord with the Seventh Circuit is the § 2253(c) case of *Hunter* v. *United States,* 101 F. 3d 1565, 1568–1573 (CA11 1996) (en banc) (relying on *Lindh* to hold certain amendments to chapter 153 applicable to pending cases). We granted certiorari limited to the question whether the new § 2254(d) applies to Lindh's case, 519 U. S. 1074 (1996), and we now reverse.

## II

Before getting to the statute itself, we have to address Wisconsin's argument that whenever a new statute on its face could apply to the litigation of events that occurred before it was enacted, there are only two alternative sources of rules to determine its ultimate temporal reach: either an "express command" from Congress or application of our *Landgraf* default rule.   In *Landgraf,* we said:

> "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.   If Congress has done so, of course, there is no need to resort to judicial default

rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect . . . . If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Landgraf, supra,* at 280.

Wisconsin insists that this language means that, in the absence of an express command regarding temporal reach, this Court must determine that temporal reach for itself by applying its judicial default rule governing retroactivity, to the exclusion of all other standards of statutory interpretation. Brief for Respondent 9–14; see also *Hunter* v. *United States, supra,* at 1569 (suggesting that *Landgraf* may have announced a general clear-statement rule regarding the temporal reach of statutes).

Wisconsin's reading, however, ignores context. The language quoted disposed of the question whether the practice of applying the law as it stands at the time of decision represented a retreat from the occasionally conflicting position that retroactivity in the application of new statutes is disfavored. The answer given was no, and the presumption against retroactivity was reaffirmed in the traditional rule requiring retroactive application to be supported by a clear statement. *Landgraf* thus referred to "express command[s]," "unambiguous directive[s]," and the like where it sought to reaffirm that clear-statement rule, but only there. See *Landgraf* v. *USI Film Products,* 511 U. S., at 263 ("[U]nambiguous directive" is necessary to authorize "retroactive application"); *id.,* at 264 (statutes "will not be construed to have retroactive effect unless their language requires this result" (internal quotation marks and citation omitted)); *id.,* at 272–273 ("Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application"); *id.,* at 286 (finding "no clear evidence of congressional intent" to rebut the "presumption

against statutory retroactivity"); *id.,* at 286 (SCALIA, J., concurring in judgment) (agreeing that "a legislative enactment affecting substantive rights does not apply retroactively absent *clear statement* to the contrary").

In determining whether a statute's terms would produce a retroactive effect, however, and in determining a statute's temporal reach generally, our normal rules of construction apply. Although *Landgraf*'s default rule would deny application when a retroactive effect would otherwise result, other construction rules may apply to remove even the possibility of retroactivity (as by rendering the statutory provision wholly inapplicable to a particular case), as Lindh argues the recognition of a negative implication would do here. In sum, if the application of a term would be retroactive as to Lindh, the term will not be applied, even if, in the absence of retroactive effect, we might find the term applicable; if it would be prospective, the particular degree of prospectivity intended in the Act will be identified in the normal course in order to determine whether the term does apply to Lindh.

### III

The statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment (except where chapter 154 otherwise makes select provisions of chapter 153 applicable to pending cases). Title I of the Act stands more or less independent of the Act's other titles[1] in providing for the revision of federal habeas practice and does two main things. First, in §§ 101–106, it amends § 2244 and §§ 2253–2255 of chapter 153 of Title 28 of the United States Code, governing all habeas corpus proceedings in the federal courts.[2]   110 Stat. 1217–

---

[1] The other titles address such issues as restitution to victims of crime (Title II), various aspects of international terrorism (Titles II, III, IV, VII, VIII), restrictions on various kinds of weapons and explosives (Titles V and VI), and miscellaneous items (Title IX).   See 110 Stat. 1214–1217.

[2] Section 103 also amends Rule 22 of the Federal Rules of Appellate Procedure.   110 Stat. 1218.

1221. Then, for habeas proceedings against a State in capital cases, § 107 creates an entirely new chapter 154 with special rules favorable to the state party, but applicable only if the State meets certain conditions, including provision for appointment of postconviction counsel in state proceedings.[3] 110 Stat. 1221–1226. In § 107(c), the Act provides that "Chapter 154 . . . shall apply to cases pending on or after the date of enactment of this Act." 110 Stat. 1226.

We read this provision of § 107(c), expressly applying chapter 154 to all cases pending at enactment, as indicating implicitly that the amendments to chapter 153 were assumed and meant to apply to the general run of habeas cases only when those cases had been filed after the date of the Act. The significance of this provision for application to pending cases becomes apparent when one realizes that when chapter 154 is applicable, it will have substantive as well as purely procedural effects. If chapter 154 were merely procedural in a strict sense (say, setting deadlines for filing and disposition, see 28 U. S. C. §§ 2263, 2266 (1994 ed., Supp. II); 110 Stat. 1223, 1224–1226), the natural expectation would be that it would apply to pending cases. *Landgraf, supra,* at 275 (noting that procedural changes "may often be applied in suits arising before their enactment without raising concerns about retroactivity"). But chapter 154 does more, for in its revisions of prior law to change standards of proof and persuasion in a way favorable to a State, the statute goes beyond "mere" procedure to affect substantive entitlement to relief. See 28 U. S. C. § 2264(b) (1994 ed., Supp. II); 110 Stat. 1223 (incorporating revised legal standard of new § 2254(d)). *Landgraf* did not speak to the rules for determining the temporal reach of such a statute (having no need to do so). While the statute might not have a true retroactive effect, neither was it clearly "procedural" so as to fall within the

---

[3] Section 108 further adds a "technical amendment" regarding expert and investigative fees for the defense under 21 U. S. C. § 848(q). 110 Stat. 1226.

Court's express (albeit qualified) approval of applying such statutes to pending cases. Since *Landgraf* was the Court's latest word on the subject when the Act was passed, Congress could have taken the opinion's cautious statement about procedural statutes and its silence about the kind of provision exemplified by the new § 2254(d) as counseling the wisdom of being explicit if it wanted such a provision to be applied to cases already pending. While the terms of § 107(c) may not amount to the clear statement required for a mandate to apply a statute in the disfavored retroactive way,[4] they do serve to make it clear as a general matter that

---

[4] In *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 34–37 (1992), this Court held that the existence of "plausible" alternative interpretations of statutory language meant that that language could not qualify as an "unambiguous" expression of a waiver of sovereign immunity. And cases where this Court has found truly "retroactive" effect adequately authorized by a statute have involved statutory language that was so clear that it could sustain only one interpretation. See *Graham & Foster* v. *Goodcell*, 282 U. S. 409, 416–420 (1931) (holding that a statutory provision "was manifestly intended to operate retroactively according to its terms" where the tax statute spelled out meticulously the circumstances that defined the claims to which it applied and where the alternative interpretation was absurd); *Automobile Club of Mich.* v. *Commissioner*, 353 U. S. 180, 184 (1957) (finding a clear statement authorizing the Commissioner of Internal Revenue to correct tax rulings and regulations "retroactively" where the statutory authorization for the Commissioner's action spoke explicitly in terms of "retroactivity"); *United States* v. *Zacks*, 375 U. S. 59, 65–67 (1963) (declining to give retroactive effect to a new substantive tax provision by reopening claims otherwise barred by statute of limitations and observing that Congress had provided for just this sort of retroactivity for other substantive provisions by explicitly creating new grace periods in which otherwise barred claims could be brought under the new substantive law). Cf. *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 55–57 (1996) (finding a clear statement of congressional abrogation of Eleventh Amendment immunity where the federal statute went beyond granting federal jurisdiction to hear a claim and explicitly contemplated "the State" as defendant in federal court in numerous provisions of the Act).

*Landgraf* suggested that the following language from an unenacted precursor of the statute at issue in that case might possibly have qualified as a clear statement for retroactive effect: "[This Act] shall apply to *all*

chapter 154 applies to pending cases when its terms fit those cases at the particular procedural points they have reached. (As to that, of course, there may well be difficult issues, and it may be that application of *Landgraf*'s default rule will be necessary to settle some of them.)

The next point that is significant for our purposes is that everything we have just observed about chapter 154 is true of changes made to chapter 153. As we have already noted, amended § 2254(d) (in chapter 153 but applicable to chapter 154 cases) governs standards affecting entitlement to relief. If, then, Congress was reasonably concerned to ensure that chapter 154 be applied to pending cases, it should have been just as concerned about chapter 153, unless it had the different intent that the latter chapter not be applied to the general run of pending cases.

Nothing, indeed, but a different intent explains the different treatment. This might not be so if, for example, the two chapters had evolved separately in the congressional process, only to be passed together at the last minute, after chapter 154 had already acquired the mandate to apply it to pending cases. Under those circumstances, there might have been a real possibility that Congress would have intended the same rule of application for each chapter, but in the rough-and-tumble no one had thought of being careful about chapter 153, whereas someone else happened to think of inserting a

---

proceedings pending on or commenced after the date of enactment of this Act." 511 U. S., at 260 (emphasis added; internal quotation marks omitted). But, even if that language did qualify, its use of the sort of absolute language absent from § 107(c) distinguishes it. Cf. *United States v. Williams*, 514 U. S. 527, 531–532 (1995) (finding a waiver of sovereign immunity "unequivocally expressed" in language granting jurisdiction to the courts over "*[a]ny* civil action against the United States for the recovery of *any* internal-revenue tax alleged to have been *erroneously* or illegally assessed or *collected*" (emphasis in *Williams;* internal quotation marks omitted)); *id.,* at 541 (SCALIA, J., concurring) ("The [clear-statement] rule does not . . . require explicit waivers to be given a meaning that is implausible . . .").

provision in chapter 154. But those are not the circumstances here. Although chapters 153 and 154 may have begun life independently and in different Houses of Congress,[5] it was only after they had been joined together and introduced as a single bill in the Senate (S. 735) that what is now § 107(c) was added.[6] Both chapters, therefore, had to have been in mind when § 107(c) was added. Nor was there anything in chapter 154 prior to the addition that made the intent to apply it to pending cases less likely than a similar intent to apply chapter 153. If anything, the contrary is true, as the discussion of § 2264(b) will indicate.

The insertion of § 107(c) with its different treatments of the two chapters thus illustrates the familiar rule that negative implications raised by disparate provisions are strongest when the portions of a statute treated differently had already been joined together and were being considered simultaneously when the language raising the implication was inserted. See *Field* v. *Mans*, 516 U. S. 59, 75 (1995) ("The more apparently deliberate the contrast, the stronger the inference, as applied, for example, to contrasting statutory sections originally enacted simultaneously in relevant respects . . ."). When § 107(c) was added, that is, a thoughtful Member of the Congress was most likely to have intended just what the later reader sees by inference.

The strength of the implication is not diminished by the one competing explanation suggested, see Brief for Respondent 11–12, which goes as follows. Chapter 154 provides for expedited filing and adjudication of habeas

---

[5] See 96 F. 3d 856, 861 (CA7 1996). Lindh concedes this much. Brief for Petitioner 23, n. 15.

[6] Amendment 1199, offered by Senator Dole on May 25, 1995, added what was then § 607(c) and now is § 107(c). See 141 Cong. Rec. 14600, 14614 (1995). A comparison of S. 735 as it stood on May 1, 1995, and S. 735 as it passed the Senate on June 7, after the substitution of Amendment 1199, reveals that the part of the bill dealing with habeas corpus reform was substantially the same before and after the amendment in all ways relevant to our interpretation of § 107(c).

applications in capital cases when a State has met certain conditions. In general terms, applications will be expedited (for a State's benefit) when a State has made adequate provision for counsel to represent indigent habeas applicants at the State's expense. Thus, § 2261(b) provides that "[t]his chapter is applicable if a State establishes . . . a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners . . . ." 110 Stat. 1221–1222. There is an ambiguity in the provision just quoted, the argument runs, for it applies chapter 154 to capital cases only where "a State establishes . . . a mechanism," leaving a question whether the chapter would apply if a State had already established such a mechanism before chapter 154 was passed. The idea is that the present tense of the word "establishes" might be read to rule out a State that already had "established" a mechanism, suggesting that when § 107(c) was added to provide that the chapter would apply to "cases pending" it was meant to eliminate the ambiguity by showing that all pending cases would be treated alike.

This explanation of the significance of § 107(c) is not, however, very plausible. First, one has to strain to find the ambiguity on which the alternative explanation is supposed to rest. Why would a Congress intent on expediting capital habeas cases have wanted to disfavor a State that already had done its part to promote sound resolution of prisoners' petitions in just the way Congress sought to encourage? It would make no sense to leave such States on the slower track, and it seems unlikely that federal courts would so have interpreted § 2261(b). Second, anyone who had seen such ambiguity lurking could have dispatched it in a far simpler and straightforward fashion than enacting § 107(c); all the drafter would have needed to do was to insert three words into § 2261(b), to make it refer to a State that "establishes or has established . . . a mechanism." It simply is not plausible

that anyone so sensitive as to find the unlikely ambiguity would be so delphic as to choose § 107(c) to fix it. Indeed, § 107(c) would (on the ambiguity hypothesis) be at least as uncertain as the language it was supposed to clarify, since "cases pending" could be read to refer to cases pending in States that set up their mechanisms only after the effective date of the Act. The hypothesis of fixing ambiguity, then, is too remote to displace the straightforward inference that chapter 153 was not meant to apply to pending cases.

Finally, we should speak to the significance of the new § 2264(b), which Lindh cites as confirming his reading of § 107(c) of the Act. While § 2264(b) does not speak to the present issue with flawless clarity, we agree with Lindh that it tends to confirm the interpretation of § 107(c) that we adopt. Section 2264(b) is a part of the new chapter 154 and provides that "[f]ollowing review subject to subsections (a), (d), and (e) of § 2254, the court shall rule on the claims [subject to expedited consideration] before it." 110 Stat. 1223. As we have said before, § 2254 is part of chapter 153 applying to habeas cases generally, including cases under chapter 154. Its subsection (a) existed before the Act, simply providing for a habeas remedy for those held in violation of federal law. Although § 2254 previously had subsections lettered (d) and (e) (dealing with a presumption of correctness to be accorded state-court factual findings and the production of state-court records when evidentiary sufficiency is challenged, respectively) the Act eliminated the old (d) and relettered the old (e) as (f); in place of the old (d), it inserted a new (d) followed by a new (e), the two of them dealing with, among other things, the adequacy of state factual determinations as bearing on a right to federal relief, and the presumption of correctness to be given such state determinations. 110 Stat. 1219. It is to these new provisions (d) and (e), then, that § 2264(b) refers when it provides that chapter 154 determinations shall be made subject to them.

Leaving aside the reference to § 2254(a) for a moment, why would Congress have provided specifically in § 2264(b) that chapter 154 determinations shall be made subject to §§ 2254(d) and (e), given the fact that the latter are part of chapter 153 and thus independently apply to habeas generally? One argument is that the answer lies in § 2264(a), which (in expedited capital cases) specially provides an exhaustion requirement (subject to three exceptions), restricting federal habeas claims to those "raised and decided on the merits in the State courts. . . ." 110 Stat. 1223. See 96 F. 3d, at 862–863. The argument assumes (and we will assume for the sake of the argument) that in expedited capital cases, this provision of § 2264(a) supersedes the requirements for exhaustion of state remedies imposed as a general matter by §§ 2254(b) and (c).[7] The argument then goes

---

[7] There are reasons why the position that § 2264(a) replaces rather than complements §§ 2254(b) and (c) is open to doubt: Lindh argues with some force that to read § 2264(a) as replacing the exhaustion requirement of §§ 2254(b) and (c) would mean that in important classes of cases (those in the categories of three § 2264(a) exceptions), the State would not be able to insist on exhaustion in the state courts. In cases raising claims of newly discovered evidence, for example, the consequence could be that the State could not prevent the prisoner from going directly to federal court and evading § 2254(e)'s presumption of correctness of state-court factual findings as well as § 2254(d)'s new, highly deferential standard for evaluating state-court rulings. It is true that a State might be perfectly content with the prisoner's choice to go straight to federal court in some cases, but the State has been free to waive exhaustion to get that result. The State has not explained why Congress would have wanted to deprive the States of the § 2254 exhaustion tools in chapter 154 cases, and we are hard pressed to come up with a reason, especially considering the Act's apparent general purpose to enhance the States' capacities to control their own adjudications. It would appear that the State's reading of § 2264(a) would also eliminate from chapter 154 cases the provisions of § 2254 that define the exhaustion requirement explicitly as requiring a claim to be raised by any and every available procedure in the State, 28 U. S. C. § 2254(c), that newly authorize federal courts to deny unexhausted claims on the merits, § 2254(b)(2), and that newly require a State's waiver of

on, that § 2264(b) is explicit in applying §§ 2254(d) and (e) to such capital cases in order to avoid any suggestion that when Congress enacted § 2264(a) to supersede §§ 2254(b) and (c) on exhaustion, Congress also meant to displace the neighboring provisions of §§ 2254(d) and (e) dealing with such things as the status of state factual determinations. But we find this unlikely. First, we find it hard to imagine why anyone would read a superseding exhaustion rule to address the applicability not just of the other exhaustion requirement but of provisions on the effect of state factual determinations. Anyone who did read the special provision for exhaustion in capital cases to supersede not only the general exhaustion provisions but evidentiary status and presumption provisions as well would have had to assume that Congress could reasonably have meant to leave the law on expedited capital cases (which is more favorable to the States that fulfill its conditions) without any presumption of the correctness of relevant state factual determinations. This would not, we think, be a reasonable reading and thus not a reading that Congress would have feared and addressed through § 2264(b). We therefore have to find a different function for the express requirement of § 2264(b) that chapter 154 determinations be made in accordance with §§ 2254(d) and (e).

Continuing on the State's assumption that § 2264(a) replaces rather than complements § 2254's exhaustion provisions, we can see that the function of providing that §§ 2254(d) and (e) be applicable in chapter 154 cases is, in fact,

exhaustion to be shown to be express, § 2254(b)(3). No explanation for why Congress would have wanted to deny the States these advantages is apparent or offered by the parties, which suggests that no such effects were intended at all but that § 2264(a) was meant as a supplement to rather than a replacement for §§ 2254(b) and (c).

Nevertheless, as stated in the text, we assume for the sake of argument that the State's understanding of § 2264(a) as replacing rather than complementing the chapter 153 exhaustion requirements for chapter 154 is the correct one. Forceful arguments can be made on each side, and we do not need to resolve the conflict here.

supportive of the negative implication apparent in § 107(c). There would have been no need to provide expressly that subsections (d) and (e) would apply with the same temporal reach as the entirely new provisions of chapter 154 if all the new provisions in both chapters 153 and 154 were potentially applicable to cases pending when the Act took effect, as well as to those filed later. If the special provision for applying §§ 2254(d) and (e) in cases under chapter 154 has any utility, then, it must be because subsections (d) and (e) might not apply to all chapter 154 cases; since chapter 154 and the new sections of chapter 153 unquestionably apply alike to cases filed after the Act took effect, the cases to which subsections (d) and (e) from chapter 153 would not apply without express provision must be those cases already pending when the Act took effect. The utility of § 2264(b), therefore, is in providing that when a pending case is also an expedited capital case subject to chapter 154, the new provisions of §§ 2254(d) and (e) will apply to that case. The provision thus confirms that Congress assumed that in the absence of such a provision, §§ 2254(d) and (e) (as new parts of chapter 153) would not apply to pending federal habeas cases.

This analysis is itself consistent, in turn, with Congress's failure in § 2264(b) to make any express provision for applying §§ 2254(f), (g), (h), or (i). Subsections (f) and (g) deal with producing state-court evidentiary records and their admissibility as evidence. Congress would obviously have wanted these provisions to apply in chapter 154 pending cases, but because they were old provisions, which had already attached to "pending" capital habeas cases (only their letter designations had been amended), Congress had no need to make any special provision for their application to pending capital habeas cases that might immediately or later turn out to be covered by chapter 154. Subsections (h) and (i), however, are new; if Congress wanted them to apply to chapter 154 cases from the start it would on our hypotheses have had to make the same special provision that § 2264(b)

made for subsections (d) and (e). But there are reasons why Congress need not have made any special provisions for subsections (h) and (i) to apply to the "pending" chapter 154 cases. Subsections (h) and (i) deal, respectively, with the appointment of counsel for the indigent in the federal proceeding, and the irrelevance to habeas relief of the adequacy of counsel's performance in previous postconviction proceedings. See 110 Stat. 1219–1220. There was no need to make subsection (h) immediately available to pending cases, capital or not, because 21 U. S. C. § 848(q)(4)(B) already authorized appointment of counsel in such cases. And there was no reason to make subsection (i) immediately available for a State's benefit in expedited capital cases, for chapter 154 already dealt with the matter in § 2261(e), see 110 Stat. 1222. There is, therefore, a good fit of the § 2264(b) references with the inference that amendments to chapter 153 were meant to apply only to subsequently filed cases; where there was a good reason to apply a new chapter 153 provision in the litigation of a chapter 154 case pending when the Act took effect, § 2264(b) made it applicable, and when there was no such reason it did no such thing.

There is only one loose end. Section 2254(a) was an old provision, without peculiar relevance to chapter 154 cases, but applicable to them without any need for a special provision; as an old provision it was just like the lettered subsections (f) and (g). Why did § 2264(b) make an express provision for applying it to chapter 154 cases? No answer leaps out at us. All we can say is that in a world of silk purses and pigs' ears, the Act is not a silk purse of the art of statutory drafting.

The upshot is that our analysis accords more coherence to §§ 107(c) and 2264(b) than any rival we have examined. That is enough. We hold that the negative implication of § 107(c) is that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective. Because Lindh's case is not one of these, we reverse the

judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

The Court in this case conducts a truncated inquiry into a question of congressional intent, and, I believe, reaches the wrong result. The Court begins, uncontroversially enough, by observing that application of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) to pending cases depends upon congressional intent, and that our inquiry into that intent should rely upon the "normal rules" of statutory construction. *Ante*, at 326. The Court then proceeds, however, to disregard all of our retroactivity case law—which it rather oddly disparages as manifestations of "*Landgraf's* default rule," *ibid.*—in favor of a permissible, but by no means controlling, negative inference that it draws from the statutory text. I would instead interpret the AEDPA in light of the whole of our longstanding retroactivity jurisprudence, and accordingly find that the amended 28 U. S. C. § 2254(d) (1994 ed., Supp. II) applies to pending cases.

The first question we must ask is whether Congress has expressly resolved whether the provision in question applies to pending cases. *Landgraf* v. *USI Film Products*, 511 U. S. 244, 280 (1994). Here, the answer is plainly no. The AEDPA does not clearly state, one way or the other, whether chapter 153 applies to pending cases. Given congressional silence, we must still interpret that statute, and that interpretation is in turn guided by the retroactivity principles we have developed over the years. The Court relies on one canon of statutory interpretation, *expressio unius est exclusio alterius*, to the exclusion of all others.

The Court's opinion rests almost entirely on the negative inference that can be drawn from the fact that Congress expressly made chapter 154, pertaining to capital cases, ap-

plicable to pending cases, but did not make the same express provision in regards to chapter 153. That inference, however, is by no means necessary, nor is it even clearly the best inference possible. Certainly, Congress might have intended that omission to signal its intent that chapter 153 not apply to pending cases. But there are other, equally plausible, alternatives.

First, because chapter 154's applicability is conditioned upon antecedent events—namely, a State's establishing qualifying capital habeas representation procedures—Congress could have perceived a greater likelihood that, absent express provision otherwise, courts would fail to apply that chapter's provisions to pending capital cases. Second, because of the characteristically extended pendency of collateral attacks on capital convictions,[1] and because of Congress' concern with the perceived acquiescence in capital defendants' dilatory tactics by some federal courts (as evidenced by chapter 154's strict time limits for adjudication of capital cases and, indeed, by the very title of the statute, the "Antiterrorism and *Effective Death Penalty* Act of 1996"), Congress could very well have desired to speak with exacting clarity as to the applicability of the AEDPA to pending capital cases. Or third, Congress, while intending the AEDPA definitely to apply to pending capital cases, could have been uncertain or in disagreement as to which of the many portions of chapter 153 should or should not apply to pending cases. Congress could simply have assumed that the courts would sort out such questions, using our ordinary retroactivity presumptions.

None of these competing inferences is clearly superior to the others. The Court rejects the first, *ante*, at 330–332, as an "implausible" solution to an "unlikely" ambiguity. But

---

[1] See, *e. g.*, Pet. for Habeas Corpus in *In re Mata*, O. T. 1995, No. 96–5679, p. 7 (describing how it took nine years and three months for a Federal District Court to deny, and the Ninth Circuit to affirm, petitioner's first federal capital habeas petition).

the solution is not nearly as implausible as the Court's contention that, in order to show that it wished chapter *153 not* to apply to pending cases, Congress chose to make chapter *154 expressly applicable* to such cases.   If Congress wanted to make chapter 153 inapplicable to pending cases, the simplest way to do so would be to say so.   But, if Congress was instead concerned that courts would interpret chapter 154, because of its contingent nature, as not applying to pending cases, the most direct way to solve that concern would be the solution it adopted: expressly stating that chapter 154 did indeed apply to pending cases.

The Court finds additional support for its inference in the new 28 U. S. C. § 2264(b) (1994 ed., Supp. II), which it believes "tends to confirm," *ante*, at 332, its analysis.   Section 2264 is part of chapter 154 and forbids (subject to narrow exceptions) federal district courts to consider claims raised by state capital defendants unless those claims were first raised and decided on the merits in state court.   Section 2264(b) provides, "[f]ollowing review subject to subsections (a), (d), and (e) of section 2254 [contained within chapter 153], the court shall rule on the claims properly before it."   This section, I believe, is irrelevant to the question before us.

The Court's somewhat tortured interpretation of this section, as a backhanded way of making §§ 2254(a), (d), and (e) (but not the rest of chapter 153) apply to pending cases, is not convincing.   For one thing, § 2264(b) is not phrased at all as a timing provision; rather than containing temporal language applying select sections to pending cases, § 2264(b) speaks in present tense, about how review should be conducted under chapter 154.   Even more tellingly, as the Court implicitly concedes when it blandly describes this provision as a "loose end," *ante*, at 336, the AEDPA did not alter § 2254(a), and so there is no need for an express provision making it applicable to pending cases.

Chapter 154 establishes special procedures for capital prisoners.   Section 2264(b), by its terms, makes clear that

§§ 2254(a), (d), and (e) apply to chapter 154 proceedings. That clarification makes sense in light of § 2264(a), which replaces the exhaustion requirement of §§ 2254(b) and (c) with a requirement that federal courts consider (subject to narrow exceptions) only those claims "raised and decided on the merits in the State courts." Without that clarification, doubt might exist as to whether the rest of § 2254 still applied in capital proceedings.

Petitioner protests that to read § 2264(a) as supplanting §§ 2254(b) and (c) would produce "outlandish" results, Brief for Petitioner 26, a conclusion that the Court finds plausible, *ante,* at 333–334, and n. 7 (although it ultimately assumes otherwise). The result would have to be "outlandish," indeed, before a court should refuse to apply the language chosen by Congress, but no such result would obtain here. Petitioner and the Court both fail to appreciate the different litigating incentives facing capital and noncapital defendants. Noncapital defendants, serving criminal sentences in prison, file habeas petitions seeking to be released, presumably as soon as possible. They have no incentive to delay. In such circumstances, §§ 2254(b) and (c) quite reasonably require that their habeas claims be filed first in state courts, so that the state judicial apparatus may have the first opportunity to address those claims. In contrast, capital defendants, facing impending execution, seek to avoid being executed. Their incentive, therefore, is to utilize every means possible to delay the carrying out of their sentence. It is, therefore, not at all "outlandish" for Congress to have concluded that in such circumstances §§ 2254(b) and (c) exhaustion would needlessly prolong capital proceedings and that § 2264(a)'s requirement that a claim have been raised and decided on the merits in state court was a sufficient protection of States' interests in exhaustion.[2]

_____

[2] This conclusion would also be consistent with the conclusions of the Powell Committee, which was convened to address the problems in capital habeas cases and upon whose recommendations chapter 154 was substan-

At this point the Court's analysis stops. Based on the weak inference from Congress' designation of chapter 154 as applying to pending cases and a strained reading of § 2264, the Court concludes that Congress impliedly intended for chapter 153 not to apply to pending cases. I would go on, and apply our ordinary retroactivity principles, as Congress no doubt assumed that we would.

First, we have generally applied new procedural rules to pending cases. *Landgraf,* 511 U. S., at 275; see also *Beazell* v. *Ohio,* 269 U. S. 167, 170–171 (1925); *Ex parte Collett,* 337 U. S. 55, 71 (1949); *Dobbert* v. *Florida,* 432 U. S. 282, 293–294 (1977); *Collins* v. *Youngblood,* 497 U. S. 37, 45 (1990). This is because "rules of procedure regulate secondary rather than primary conduct." *Landgraf, supra,* at 275. Here, the primary conduct occurred when Lindh murdered two people in the sheriff's office of the City-County Building in Madison, Wisconsin. Obviously, the AEDPA in no way purports to regulate that past conduct. Lindh's state-court proceedings constituted secondary conduct. Under our retroactivity

tially based. See Judicial Conference of the United States, Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Committee Report and Proposal (Aug. 23, 1989). The Committee's Comment to Proposed § 2259 (which tracks the AEDPA's § 2264) explained as follows: "As far as new or 'unexhausted' claims are concerned, [this section] represents a change in the exhaustion doctrine as articulated in *Rose* v. *Lundy,* 455 U. S. 509 (1982). [This section] bars such claims from consideration unless one of the . . . exceptions is applicable. The prisoner cannot return to state court to exhaust even if he would like to do so. On the other hand, if [an exception] is applicable, the district court is directed to conduct an evidentiary hearing and to rule on the new claim without first exhausting state remedies as *Rose* v. *Lundy* now requires. Because of the existence of state procedural default rules, *exhaustion is futile in the great majority of cases.* It serves the state interest of comity in theory, but in practice it results in delay and undermines the state interest in the finality of its criminal convictions. *The Committee believes that the States would prefer to see post-conviction litigation go forward in capital cases, even if that entails a minor subordination of their interest in comity as it is expressed in the exhaustion doctrine." Id.,* at 22–23 (emphasis added).

precedents, were his state proceedings in federal court, we would have then applied existing procedural law, even though Lindh's primary conduct occurred some time earlier. The federal habeas proceeding at issue here is, in a sense, tertiary conduct. It is not the actual criminal conduct prohibited by law, nor is it the proceeding to determine whether the defendant in fact committed such conduct. Rather, it is a collateral proceeding that, in effect, attacks the judgment of the prior state proceeding. Section 2254(d), the precise section at issue here, simply alters the standard under which that prior judgment is evaluated, and is in that sense entirely procedural. Cf. *Horning* v. *District of Columbia,* 254 U. S. 135, 139 (1920) (applying newly enacted harmless-error statute, which changed the standard under which prior judgments were evaluated, to pending case).

Second, we have usually applied changes in law to prospective forms of relief. *Landgraf, supra,* at 273; see also *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, 464 (1921); *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 201 (1921); *Hall* v. *Beals,* 396 U. S. 45, 48 (1969) *(per curiam); Kaiser Aluminum & Chemical Corp.* v. *Bonjorno,* 494 U. S. 827, 852 (1990) (SCALIA, J., concurring). Unlike damages actions, which are "quintessentially backward looking," *Landgraf, supra,* at 282, the writ of habeas corpus is prospective in nature. Habeas does not compensate for past wrongful incarceration, nor does it punish the State for imposing it. See *Lane* v. *Williams,* 455 U. S. 624, 631 (1982). Instead, habeas is a challenge to unlawful custody, and when the writ issues it prevents further illegal custody. See *Preiser* v. *Rodriguez,* 411 U. S. 475, 489, 494 (1973).

Finally, we have regularly applied statutes ousting jurisdiction to pending litigation.[3] *Landgraf, supra,* at 274; see

---

[3] Although in *Hughes Aircraft Co.* v. *United States ex rel. Schumer,* 520 U. S. 939 (1997), we recently rejected a presumption favoring retroactivity for jurisdiction-*creating* statutes, see *id.,* at 950–951, nothing in *Hughes*

also *Bruner* v. *United States,* 343 U. S. 112, 116–117, and n. 8 (1952) ("Congress has not altered the nature or validity of petitioner's rights or the Government's liability but has simply reduced the number of tribunals authorized to hear and determine such rights and liabilities"); *Hallowell* v. *Commons,* 239 U. S. 506, 508 (1916); *Sherman* v. *Grinnell,* 123 U. S. 679, 680 (1887); *Assessors* v. *Osbornes,* 9 Wall. 567, 575 (1870); *Ex parte McCardle,* 7 Wall. 506, 514 (1869); *Insurance Co.* v. *Ritchie,* 5 Wall. 541, 544–545 (1867). This is because such statutes "'speak to the power of the court rather than to the rights or obligations of the parties.'" *Landgraf, supra,* at 274 (quoting *Republic Nat. Bank of Miami* v. *United States,* 506 U. S. 80, 100 (1992) (THOMAS, J., concurring)); see also 511 U. S., at 293 (SCALIA, J., concurring in judgment) ("Our jurisdiction cases are explained, I think, by the fact that the purpose of provisions conferring or eliminating jurisdiction is to permit or forbid the exercise of judicial power—so that the relevant event for retroactivity purposes is the moment at which that power is sought to be exercised"). This is the principle most relevant to the case at hand.

There is a good argument that § 2254(d) is itself jurisdictional. See *Brown* v. *Allen,* 344 U. S. 443, 460 (1953) ("Jurisdiction over applications for federal habeas corpus is controlled by statute"); *Sumner* v. *Mata,* 449 U. S. 539, 547, n. 2 (1981) ("The present codification of the federal habeas statute is the successor to 'the first congressional grant of jurisdiction to the federal courts,' and the 1966 amendments embodied in § 2254(d) [now codified, as amended by the AEDPA, at § 2254(e)] were intended by Congress as limitations on the exercise of that jurisdiction" (quoting *Preiser* v. *Rodriguez, supra,* at 485)); cf. *Arkansas* v. *Farm Credit Servs. of Central Ark.,* 520 U. S. 821, 826 (1997) (explaining that the Tax Injunction Act—which has operative language similar to

disparaged our longstanding practice of applying jurisdiction-*ousting* statutes to pending cases.

§ 2254(d) ("The district courts shall not enjoin . . . .")—is "first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes" (internal quotation marks omitted)). But even if it is not jurisdictional, it shares the most salient characteristic of jurisdictional statutes: Its commands are addressed to courts rather than to individuals. Section 2254(d) does not address criminal defendants, or even state prosecutors; it prescribes or proscribes no private conduct. Instead, it is addressed directly to federal courts, providing, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court *shall not be granted* . . . unless . . . ." (Emphasis added.)

Whether the approach is framed in terms of "retroactive effect," as the *Landgraf* majority put it, 511 U. S., at 280, or in terms of "the relevant activity that the rule regulates," as JUSTICE SCALIA's concurrence put it, see *id.*, at 291 (opinion concurring in judgment), our longstanding practice of applying procedural, prospective, and jurisdiction-ousting statutes to pending cases must play an important part in the decision. These principles all favor application of § 2254(d) to pending cases.

It is a procedural statute, regulating prospective relief, and addressed directly to federal courts and removing their power to give such relief in specified circumstances. Our cases therefore strongly suggest that, absent congressional direction otherwise, we should apply § 2254(d) to pending cases. This is not because of any peculiar characteristic intrinsic to the writ of habeas corpus, but rather because modifications to federal courts' authority to issue the writ are necessarily of that stripe—procedural, prospective, and addressed to courts. It is therefore not surprising that the parties have not pointed us to a single case where we have found a modification in the scope of habeas corpus relief inapplicable to pending cases. To the contrary, respondent and

*amici* have pointed instead to the uniform body of our cases applying such changes to all pending cases. This has been true both of statutory changes in the scope of the writ, see, *e. g., Gusik* v. *Schilder,* 340 U. S. 128, 131–133, and n. 4 (1950) (applying 1948 habeas amendments to pending claims); *Smith* v. *Yeager,* 393 U. S. 122, 124–125 (1968) *(per curiam)* (applying 1966 habeas amendments to pending claims); *Cara-fas* v. *LaVallee,* 391 U. S. 234, 239 (1968) (same); *Felker* v. *Turpin,* 518 U. S. 651 (1996) (applying different section of the AEDPA to pending case), and of judicial changes, see, *e. g., Stone* v. *Powell,* 428 U. S. 465, 495, n. 38 (1976) (rejecting petitioner's contention that change in law should apply pro-spectively); *Sumner* v. *Mata, supra,* at 539, 549–551 (apply-ing presumption of correctness of state-court findings of fact to pending case); *Wainwright* v. *Sykes,* 433 U. S. 72 (1977) (applying the cause and prejudice doctrine to pending case); *Brecht* v. *Abrahamson,* 507 U. S. 619, 638–639 (1993) (apply-ing actual prejudice standard to pending case).

Because the Court's inquiry is incomplete, I believe it has reached the wrong result in this case. I would affirm the judgment of the Court of Appeals.