# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                                    Elisabeth A. Shumaker
    Clerk                                                                        Chief Deputy Clerk

February 4, 1999


**TO:** ALL RECIPIENTS OF THE OPINION

**RE:** 97-3323, *Tyler v. Nelson*
        Filed on January 5, 1999

The slip opinion filed in this case contains a citation error on page 7, lines 7-15. The corrected sentences should appear as follows:

Thus, while "we review the legal bases for the district court's dismissal of [the] petition de novo, we afford deference to the state court's construction of state law." Id. (citation omitted). We lack authority to correct errors of state law made by state courts. See id.; King v. Champion, 55 F.3d 522, 527 (10th Cir. 1995). We presume that the state court's factual findings are correct, and we review the district court's factual findings for clear error. See Jackson, 143 F.3d at 1317 (citing 28 U.S.C. § 2254(d) (pre-amendment)); Nguyen v. Reynolds, 131 F.3d 1340, 1359 (10th Cir. 1997), cert. denied, __ U.S. __, 119 S. Ct. 128 (1998).

A copy of the corrected page 7 is attached for your convenience.

Very truly yours,
Patrick Fisher, Clerk of Court


By:

Keith Nelson
Deputy Clerk


encl.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 5 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ST. JOHN TYLER,

      Petitioner - Appellant,

v.

MICHAEL NELSON, Warden, and
ATTORNEY GENERAL OF
KANSAS,

      Respondents - Appellees.

No. 97-3323

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 94-CV-3246)**

---

Jean Gillis Phillips (David J. Gottlieb, Director and Professor of Law, The Paul E.
Wilson Defender Project, University of Kansas School of Law, Lawrence, Kansas,
on the brief), Lawrence, Kansas, for Petitioner-Appellant.

Jared S. Maag, Assistant Attorney General, Criminal Litigation Division, Topeka,
Kansas, for Respondents-Appellees.

_____

Before **BALDOCK**, **McKAY**, and **HENRY**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

In state court proceedings, Petitioner pled guilty to a charge of conspiracy to sell cocaine and went to trial on the remaining counts of second degree murder, sale of cocaine, aggravated assault of a law enforcement officer, possession of heroin with intent to sell, and perjury. The jury convicted Petitioner on all of these counts. The Kansas Supreme Court set forth the underlying facts in detail in its decision affirming Petitioner's convictions on direct appeal. See State v. Tyler, 840 P.2d 413 (Kan. 1992). We include only those facts relevant to our consideration of the issues raised on appeal.

On February 2, 1988, Sedgwick County Sheriff's officers obtained a search warrant for a residence in Wichita, Kansas, following a controlled buy of cocaine at the residence earlier that day. In preparation for executing the warrant, officers from the Sheriff's Department and from the Wichita Police Department convened to discuss the available information concerning the layout and the occupants of the residence. The officers also developed a plan for executing the warrant, pursuant to which eight officers would enter the house and four would remain outside. Each of the eight officers who entered the house was assigned to secure a certain area of the house. For example, Detective James McNutt was assigned to open the screen door and secure the living room, while Detective Terry McNett was instructed to secure the kitchen. Detective McNutt wore his sheriff's uniform. Five other officers, including Detective McNett, wore blue jackets with

-2-

cloth sheriff's badges on the front and large yellow letters on the back reading "SHERIFF'S NARCOTICS." These five officers also wore blue ballcaps with cloth sheriff's badges on the front. The remaining two officers wore Wichita Police Department uniforms. As the team of officers approached and entered the house, they shouted identifying statements such as "sheriff's officers," "search warrant," and "sheriff's office, no one move."

After entering the house, Detective McNutt ordered one of the occupants to stand against the wall. Detective James Woods ran down the hall and kicked down the door of the southeast bedroom. Detective Sergeant Danny Bardezbain pumped a shotgun to instill fear in the residents. Meanwhile, with his gun drawn, Detective McNett ran into the kitchen where Petitioner shot and killed him. Petitioner also fired at least one shot in the direction of Sergeant Bardezbain. Next, Detective Terry Parham entered the kitchen and shot and wounded Petitioner in both of his legs. Without further incident, officers took Petitioner into custody. He and others found in the residence subsequently were arrested. A second warrant was issued in connection with the homicide. The execution of the original warrant and the second warrant yielded cocaine, drug paraphernalia, and other evidence.

Trial testimony regarding the raid was conflicting. Sonya Wheeler, who sold drugs for Petitioner from the residence, testified that she and Petitioner were

sitting in the living room when the raid began, and that they ran into the kitchen when officers entered the front door. Another witness, Richard Polite, also testified that Ms. Wheeler and Petitioner were in the living room when police entered the house. Ms. Wheeler testified that while she was in the kitchen, she tried to throw a gun into the trash but missed and she threw some drugs on the floor. In addition, Ms. Wheeler testified that Detective McNett was only a foot or two away from her when Petitioner shot him, and that Petitioner was standing right behind her. Ms. Wheeler also testified that two weeks prior to the raid Petitioner had told her that if officers ever attempted to take him into custody, he "would take someone out." R., Tr. Trans. at 417-18.

Other witnesses who were in the residence at the time of the raid testified that they did not hear the police officers announce their identity, but they assumed that the intruders were police based on their race and the fact that they had guns. Trial testimony also indicated that some of the occupants who did not hear or understand the officers' identifying statements thought that the intruders were robbers because they had heard a rumor that the house would be robbed. At trial, Ms. Wheeler testified that she knew the people entering the residence were police officers because she had heard them identify themselves. Ms. Wheeler also testified that she previously had lied to police to protect herself and Petitioner. Prior to testifying at trial, Ms. Wheeler gave five different statements to police.

-4-

Some of these statements reflect that she did not know that the intruders were police. However, shortly after the State charged Ms. Wheeler with first-degree murder of Detective McNett, she gave her final statement to police, which was consistent with her trial testimony. Two days later, the State dismissed the charges of first degree murder and aggravated assault on a law enforcement officer against her. The State also agreed to recommend minimum sentencing for the two crimes to which Ms. Wheeler pled guilty, namely conspiracy and possession with intent to sell. At trial, Ms. Wheeler denied that her plea agreement required her to testify against Petitioner, but she was not sentenced until Petitioner's trial ended.

Petitioner's trial testimony differed from Ms. Wheeler's in several respects. He testified that he and Ms. Wheeler were in the kitchen when police entered the house, and that he did not know that the intruders were police officers. Instead, he thought the intruders were robbers who had entered the house and had started shooting people. Petitioner specifically indicated that he thought Detective McNett was a robber even though he was one of the officers wearing a blue jacket and ballcap with sheriff's badges. He claimed that Detective McNett's long hair, beard, jeans, and sneakers contributed to this impression. Thus, Petitioner testified that when Detective McNett entered the kitchen with his gun drawn, he thought Detective McNett was going to kill him.

Despite Petitioner's request, the state trial court refused to instruct the jury on self-defense. However, the court instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter. The jury returned a verdict of second-degree murder on that count. The trial court sentenced Petitioner to a controlling term of 111 to 330 years' imprisonment; and, as mentioned above, the Kansas Supreme Court affirmed Petitioner's convictions on direct appeal on October 30, 1992. See Tyler, 840 P.2d at 435.

Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on June 10, 1994. In an opinion dated September 30, 1997, the district court denied Petitioner's habeas corpus petition. See Tyler v. Nelson, 978 F. Supp. 1435, 1439 (D. Kan. 1997). Petitioner then filed a motion for a certificate of appealability to appeal the court's denial of his petition. In its responsive order, the district court noted that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 do not apply to Petitioner's appeal because his petition was filed prior to its enactment. The court therefore construed Petitioner's motion as a motion for a certificate of probable cause and granted it, explaining that "the issues presented by this action deserve further review." R., Vol. I, Doc. 39, at 2.

I.

-6-

This court "may grant habeas relief to a state prisoner only if state court error 'deprived him of fundamental rights guaranteed by the Constitution of the United States.'" Jackson v. Shanks, 143 F.3d 1313, 1317 (10th Cir.) (quoting Brinlee v. Crisp, 608 F.2d 839, 843 (10th Cir. 1979)), cert. denied, __ U.S. __, 119 S. Ct. 378 (1998). Because this case was filed before the AEDPA's enactment, pre-amendment standards of review apply. See id. (citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 2063 (1997)). Thus, while "we review the legal bases for the district court's dismissal of [the] petition de novo, we afford deference to the state court's construction of state law." Id. (citation omitted). We lack authority to correct errors of state law made by state courts. See id.; King v. Champion, 55 F.3d 522, 527 (10th Cir. 1995). We presume that the state court's factual findings are correct, and we review the district court's factual findings for clear error. See Jackson, 143 F.3d at 1317 (citing 28 U.S.C. § 2254(d) (pre-amendment)); Nguyen v. Reynolds, 131 F.3d 1340, 1359 (10th Cir. 1997), cert. denied, __ U.S. __, 119 S. Ct. 128 (1998). Where the district court's factual findings are based solely upon a review of the state court record, however, they are subject to this court's independent review. See Cunningham v. Diesslin, 92 F.3d 1054, 1062 n.6 (10th Cir. 1996).

II.

Petitioner first claims that the district court erred in determining that the state trial court's refusal to instruct the jury on self-defense did not deny him due process of law. We employ a highly deferential standard of review in evaluating the state trial court's refusal to deliver Petitioner's requested self-defense instruction. "As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" Nguyen, 131 F.3d at 1357 (quoting Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981)); see also Maes v. Thomas, 46 F.3d 979, 984 (10th Cir.) ("A state trial conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial."), cert. denied, 514 U.S. 1115 (1995). Thus, the burden on a petitioner attacking a state court judgment based on a refusal to give a requested jury instruction is especially great because "'[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" Maes, 46 F.3d at 984 (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

To determine whether the state trial court's refusal to deliver a self-defense instruction violated Petitioner's federal constitutional right to due process, we must turn to Kansas self-defense law to assess whether, under state law, Petitioner

was entitled to such an instruction.  Under Kansas law, "[a] person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself . . . against such aggressor's imminent use of unlawful force."  Kan. Stat. Ann. § 21-3211.  Interpreting this statute, the Kansas Supreme Court has established a two-part test for determining whether a defendant is entitled to a self-defense instruction.  The first prong is subjective and requires evidence indicating that "'the defendant honestly and sincerely believed it would be necessary to kill in self-defense.'"  State v. Sims, 960 P.2d 1271, 1274 (Kan. 1998) (quoting State v. Sims, 936 P.2d 779, 784 (Kan. 1997)).  The second prong is objective and requires evidence showing that "'a reasonable person would have perceived the necessity of self-defense.'"  Id. (quoting Sims, 936 P.2d at 784).

The Kansas Supreme Court has indicated that the defendant's own testimony may constitute sufficient evidence to entitle him to a self-defense instruction.  For example, the court has stated that "[i]t is the duty of the trial court to instruct the jury on self-defense so long as there is any evidence tending to establish self-defense, although the evidence may be slight and may consist solely of the defendant's own testimony."  State v. Hill, 744 P.2d 1228, 1236 (Kan. 1987).  The court has also emphasized that amount of evidence required is minimal:  "'[I]t is well to remember the test is not how much but is there any'"

-9-

evidence in support of the defendant's theory of self-defense. State v. Childers, 563 P.2d 999, 1101 (Kan. 1977) (citation omitted).

Based on our review of the Kansas cases applying the two-part test, however, we conclude that while a defendant's own assertions may be sufficient to support the first prong of the test, i.e. to establish a subjective belief that self-defense was necessary, fulfilling the second prong requires something more. See, e.g., Hill, 744 P.2d at 1236 ("The issue is whether there is any evidence supporting defendant's statement that the force she used was necessary to defend herself."); Childers, 563 P.2d at 1011 (stating that although defendant's testimony indicated he may have believed he was in danger, "there was absolutely no evidence to support such a belief"). Unlike the first prong of the test, the second prong calls for an objective determination concerning the reasonableness of the belief that self-defense was required. See Childers, 563 P.2d at 1012 (noting that there must be some evidence to "persuade a reasonable man to believe that he was in imminent danger"). Just as evaluating whether an error is harmless requires this court to assess the effects of the error in light of the record as a whole, see, e.g., United States v. McVeigh, 153 F.3d 1166, 1204 (10th Cir. 1998) (citing Kotteakos v. United States, 328 U.S. 750, 764 (1946)), applying the second prong of the Kansas self-defense test involves evaluating the evidence presented by the defendant in light of the totality of the circumstances and making an assessment

about the reasonableness of the defendant's belief that self-defense was necessary. Because the second prong of the test cannot rest merely on the defendant's own, uncorroborated assertions, its application necessarily involves an exercise of discretion.

Applying the foregoing standards, we conclude that, although Petitioner has come forth with a modicum of evidence tending to establish his subjective belief that self-defense was necessary, he cannot meet the second prong of the test because the record simply does not show that "a reasonable person would have perceived the necessity of self-defense." Sims, 936 P.2d at 784. Petitioner's testimony that he thought Detective McNett was a robber and that he did not hear the identifying statements made by the officers as they entered the house may be sufficient to meet the first prong of the test. However, Petitioner shot Detective McNett at close range in a lighted room. Although Detective McNett had long hair, he also wore dark blue clothing and had two readily visible sheriff's badges on his jacket and his ballcap. Further, although Detective McNett entered the kitchen with his gun drawn, there is no indication in the record that he otherwise threatened or made any aggressive movements toward Petitioner. Petitioner also admitted that he knew his drug operation might be raided by police, and according to Ms. Wheeler's testimony, he previously told her that if he was ever confronted by police, he might "take someone out." Other persons present during the raid,

including Ms. Wheeler, testified that they heard the officers identify themselves, and that those who did not hear the officers' identifying statements inferred their status as police officers from their race and guns.  In light of the totality of the circumstances, we agree with the Kansas Supreme Court's determination that no reasonable person would have believed that the use of force was necessary in this situation.  We also conclude that the court's determination is consistent with its previous construction and application of the objective prong of the self-defense test.  We therefore agree with the district court that Petitioner has not met his heavy burden of demonstrating that the trial court's refusal to deliver a self-defense instruction rendered the trial so fundamentally unfair as to deny him his rights to a fair trial and to due process.[1]

### III.

Petitioner also alleges that his right to a fair trial was violated by the state trial court's decision not to remove or conceal the memorial plaque to Detective

---

[1]We note that the difference between the more limited scope of review we apply to state court proceedings and the standard of review we employ in reviewing federal district court decisions, along with differences between state and federal substantive law, help to explain the disparate outcomes between this case and seemingly similar decisions by this court.  See, e.g., United States v. Benally, 146 F.3d 1232, 1235-36 (10th Cir. 1998) (remanding for new trial where defendant's testimony, if credited by the jury, could have led jury to believe that self-defense was reasonable in light of the threat presented).

-12-

McNett from the courthouse during his trial. The plaque hangs in the lobby of the

Sedgwick County Courthouse and measures sixteen by eighteen inches. It states:

"IN MEMORY OF DETECTIVE TERRY McNETT who was killed in the line of

duty on February 3, 1988 while participating in a criminal investigation which

involved the execution of a search warrant for illegal narcotics and dangerous

drugs." Tyler, 978 F. Supp. at 1438. Prior to his trial, Petitioner filed a motion

requesting the removal or concealment of the plaque during the trial. The trial

court denied his motion, finding that the jury's oath to try the case

conscientiously and to return a verdict based solely upon the admitted evidence

would protect the integrity of the proceedings. The Kansas Supreme Court

affirmed, ruling that Petitioner had not shown prejudice from the trial court's

refusal to remove or conceal the plaque. See Tyler, 840 P.2d at 430. In

dismissing Petitioner's habeas corpus petition, the district court found that the

memorial plaque to Detective McNett was not inherently prejudicial and that

Petitioner did not demonstrate any actual prejudicial effect on any juror. See

Tyler, 978 F. Supp. at 1438-39.

We note at the outset that, because Petitioner raises a constitutional

challenge to a state court proceeding, the scope of our review is constrained. See

Holbrook v. Flynn, 475 U.S. 560, 572 (1986). Like any person accused of a

crime, Petitioner was entitled to have his guilt or innocence determined only on

-13-

the basis of the evidence offered at his trial.  See Taylor v. Kentucky, 436 U.S. 478, 485 (1978); United States v. Lampley, 127 F.3d 1231, 1237 (10th Cir. 1997), cert. denied, __ U.S. __, 118 S. Ct. 1098 (1998).  Trial courts are therefore responsible for guaranteeing that juries are fair and impartial.  See Lampley, 127 F.3d at 1236 (citing Frazier v. United States, 335 U.S. 497, 511 (1948)).  Part of this responsibility entails assuring that trial surroundings are not exceedingly prejudicial.  The framework established by the Supreme Court in Holbrook guides our analysis of this issue.

First, we must examine whether hanging the memorial plaque in the courthouse lobby "is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  Holbrook, 475 U.S. at 568-69.  We may grant Petitioner relief only if the "scene presented to the jurors . . . was so inherently prejudicial as to pose an unacceptable threat to [Petitioner's] right to a fair trial."  Id. at 572.  Applying these standards, we conclude that the memorial plaque is not, like shackling and prison clothes, an "unmistakable indication[] of the need to separate a defendant from the community at large."  Id. at 569.  Like the presence of guards at a defendant's trial, the plaque "need not be interpreted as a sign that [Petitioner] is particularly dangerous or culpable."  Id.  The memorial plaque was small and therefore was not necessarily noticeable.  Further, it was not located in

-14-

the courtroom nor did it mention Petitioner's name. Although the plaque may have served as a reminder of a police officer's death, it did not necessarily serve as a reminder of Petitioner's guilt or his special status as a defendant. See id.

Second, because we conclude that the presence of the plaque was not so inherently prejudicial that it could be justified only by an essential state interest specific to the trial, we must determine whether Petitioner suffered actual prejudice. See id. at 572. Petitioner did not make a showing of any actual prejudicial effect on any juror before the district court, nor does he make such a showing on appeal. "We will not presume prejudice where the record does not support a claim of inherently prejudicial activity or incident." Lampley, 127 F.3d at 1237. In light of the foregoing, we agree with the district court's conclusion that the state trial court's refusal to remove or conceal the memorial plaque from the courthouse lobby did not violate Petitioner's constitutional right to a fair trial.

IV.

Finally, Petitioner argues that the state trial court violated his right to a fair trial by refusing to poll the jury about whether they had seen an allegedly prejudicial television report regarding his case which was aired one evening during the trial. Trial courts have "a duty to protect the jury from prejudicial events," United States v. Gonzalez, 797 F.2d 915, 917 (10th Cir. 1986) (citing

Sheppard v. Maxwell, 384 U.S. 333, 363 (1966)), and "to investigate any potential prejudice that may have occurred" before or during the trial. Id. at 917 (citing United States v. Beitscher, 467 F.2d 269, 274 (10th Cir. 1972)); see also Chandler v. Florida, 449 U.S. 560, 582 (1981). Our review of state court proceedings is limited to determining whether a federal constitutional violation occurred. See Chandler, 449 U.S. at 570.

The Kansas Supreme Court determined that Petitioner had failed to show that the news broadcast had any effect upon the jury's verdict. See Tyler, 840 P.2d at 431. The district court agreed, concluding that Petitioner had not made any showing that the trial was contaminated by the allegedly prejudicial television report or that he was denied due process as a result. See Tyler, 987 F. Supp. at 1439. Similarly, we can find no indication in the record that any of the jurors were influenced by the report, nor can we tell whether the jurors even saw the report. None of the courts involved in this case have received a copy or transcript of the television report, which makes it impossible to determine whether the report was incorrect, inflammatory, or otherwise prejudicial. Additionally, we note that the state trial court repeatedly admonished the jury to avoid reading or listening to any media account of the trial, see id., and we presume that the jury followed the instructions. See United States v. Hatatley, 130 F.3d 1399, 1405 (10th Cir. 1997). "In short, there is no showing that the trial was compromised by

-16-

[the television broadcast]." <u>Chandler</u>, 449 U.S. at 582. We agree with the district court that no due process violation occurred.

The district court's denial of Petitioner's habeas corpus petition is **AFFIRMED**.