**UNITED STATES of America ex rel. Joseph BARNES, Petitioner,**

v.

**Jerry D. GILMORE, Respondent.**

**No. 97 C 3677.**

United States District Court, N.D. Illinois, Eastern Division.

Dec. 29, 1997.

Joseph Barnes, pro se.

Darryl B. Simko, Assistant Attorney General, Chicago, IL, for Defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Warden Jerry Gilmore ("Gilmore") has filed two motions to follow up on this Court's November 26 denial (in the "Order") of Gilmore's motion to dismiss the 28 U.S.C. § 2254 [1] habeas corpus petition ("Petition") brought by Joseph Barnes ("Barnes"), which Gilmore's earlier motion had urged was time-barred:

    1.  a motion to reconsider the Order or, alternatively, to issue an order under Section 1292(b) looking to the possible appealability of the Order; and

1.  All further references to Title 28's provisions

    · 2.  a motion seeking leave to file supplemental authority in support of the first motion.

On December 24, 1997 this Court granted the second motion (of course) and took the first one under advisement. This memorandum opinion and order now addresses the first motion.

■   Gilmore proffers a dual attack on the timeliness of Barnes' Petition, one on the basis that the "mailbox rule" of *Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) does not apply to the filing date of habeas petitions and the other on the basis that Barnes paid the filing fee too late, even if the Petition itself had been delivered within the one-year period prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("Act"), as construed in *Lindh v. Murphy,* 96 F.3d 856, 866 (7th Cir.1996) (en banc), *rev'd in other respects* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Upon reconsideration, this Court continues to reject the first of those propositions, but it finds the second to be persuasive, and hence it grants the motion for reconsideration and dismisses the Petition as time-barred.

On the first subject, Gilmore's second motion has tendered for this Court's consideration the December 15, 1997 memorandum opinion and order issued by Honorable Paul Plunkett in *United States ex rel. Banks v. Barnett,* No. 97 C 3388, 1997 WL 786666 which rejects the *Houston* precedent in the habeas context. With all respect to its esteemed colleague Judge Plunkett, this Court is constrained to disagree.

Although legal analysis is never a matter of the mere counting of noses, it is surely worth observing (as Order at 3 has pointed out) that the only Court of Appeals decision that has dealt directly with the issue to date has signed on affirmatively to *Houston's* applicability in habeas cases before the District Court (*In re Sims,* 111 F.3d 45, 47 (6th Cir.1997) (per curiam)). In addition, dicta by the Second Circuit (*Peterson v. Demskie,* 107 F.3d 92, 93 (2d Cir.1997)) and the Eighth Circuit (*Miller v. Benson,* 51 F.3d 166, 169 n.

will simply take the form "Section—."

2 (8th Cir.1995)) point in exactly the same direction, while *no* Court of Appeals has gone the other way. As for District Courts, the substantial preponderance of the decisions run the same way (see, e.g., *Parker v. Bowersox,* 975 F.Supp. 1251, 1253 (W.D.Mo.1997); *Hughes v. Irvin,* 967 F.Supp. 775, 778 (E.D.N.Y.1997)).

Apart from Judge Plunkett's opinion in Banks, the principal contention of the one or two courts that have held that the date of receipt in the Clerk's Office, rather than the date of delivery to the prison authorities, is the effective "filing" date for habeas petitions is that one year (which is now the habeas limitation period under the Act) is much longer than the 30–day time for appeal of habeas denials that was at issue in *Houston,* so that a prisoner assertedly doesn't have much need for the benefit of the "mailbox rule." But that approach ignores the basic nature of every statute of limitations as a bright-line rule on which a litigant is entitled to rely: Nothing requires an Illinois personal injury plaintiff (for example) to enter the courthouse *before* the second anniversary of the tortious event that harmed him or her, although even one day beyond that is as fatal on limitations grounds as a ten-year delay in bringing suit.[2]

There is surely no policy reason that the same bright-line concept (and the same entitlement to rely on it) should not apply to the limitations period for habeas petitions in the selfsame fashion as those things apply to every other statute of limitations. And the strength of the *Houston* proposition rests on the principle—which is applicable with just as much force to habeas petitions as to the habeas appeal at issue in *Houston* itself— that a prisoner cannot control the handling of his or her legal mail once it is given to the prison authorities. As *Miller,* 51 F.3d at 169 n. 2 (numerous citations omitted) said in the course of its discussion:

> A good argument can be made for extending the rule in *Houston v. Lack* to filings other than notices of appeal. *"Houston [v.*

*Lack]*'s underlying policy—that of not penalizing pro se prisoners for delays over which they have no control once they have timely delivered notices of appeal to prison authorities—applies with equal force to section 1983 actions." ."In fact, prison authorities would have greater incentive to delay the processing of section 1983 suits, since such suits often target prison officials." Other circuits have extended the rule in *Houston v. Lack* to other pro se prisoner filings.

Indeed, this very case provides a graphic illustration of just that problem. Barnes delivered his habeas papers to the prison authorities on April 22, 1997 (just within the one-year period prescribed by the Act as construed in *Lindh* ), but some unexplained mishandling after the papers had left Barnes' hands resulted in their being delivered to this District Court substantially later—after some further back and forth, they were not stamped "Received" in the Clerk's Office until May 15 (more than three weeks after Barnes had given them to the prison authorities). If Barnes had tendered them to the authorities say two weeks earlier—fully 15 days *before* the one-year limitations period ran out, and surely in enough time to allow for any reasonable delay in the mails—and if the same delaying events · had ensued, he would have been out of time (and hence totally out of luck) unless he could claim the benefits of the "mailbox rule." And the minute that we depart from an objective standard and instead allow uncontrollable contingencies to control timeliness, the goals of certainty and fairness that underlie the bright-line concept of a statute of limitations are defeated.

*Banks* goes on in an effort to support the rejection of the mailbox rule by pointing to part of the language of Rule 3 of the Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"), which will be quoted in its entirety here for

---

**2.** This Court has recently had occasion to liken the statute of limitations bright-line approach to the famous bit of philosophy voiced by Mr. Micawber in Chapter 12 of Charles Dickens' *David Copperfield:*

> Annual income twenty pounds, annual expenditure nineteen nineteen six, result happiness. Annual income twenty pounds, annual expenditure twenty pounds ought and six, result misery.

reasons that will become apparent during the course of this opinion:

(a) **Place of filing; copies; filing fee.** A petition shall be filed in the office of the clerk of the district court. It shall be accompanied by two conformed copies thereof. It shall also be accompanied by the filing fee prescribed by law unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis. If the petitioner desires to prosecute the petition in forma pauperis, he shall file the affidavit required by 28 U.S.C. § 1915. In all such cases the petition shall also be accompanied by a certificate of the warden or other appropriate officer of the institution in which the petitioner is confined as to the amount of money or securities on deposit to the petitioner's credit in any account in the institution, which certificate may be considered by the court in acting upon his application for leave to proceed in forma pauperis.

(b) **Filing and service.** Upon receipt of the petition and the filing fee, or an order granting leave to the petitioner to proceed in forma pauperis, and having ascertained that the petition appears on its face to comply with rules 2 and 3, the clerk of the district court shall file the petition and enter it on the docket in his office. The filing of the petition shall not require the respondent to answer the petition or otherwise move with respect to it unless so ordered by the court.

Quoting only from the language of the first sentence of Section 2254 Rule 3(b), the *Banks* opinion asserts:

By its terms, Rule 3 prohibits application of the mailbox rule to habeas petitions.

But again with all respect, that conclusion is also fatally flawed.

It must be remembered that when *Houston* was decided, Fed.R.App.P. ("App.R.") 3(a) and 4(a)(1), just like Section 2254 Rule 3, specifically spoke in terms of filing "with the clerk of the district court" (*Houston,* 487 U.S. at 272, 108 S.Ct. at 2383). But what *Houston* nevertheless held was that in the special context of prisoner litigation, the prison authorities were to be viewed effectively as an outpost of the District Court clerk's office for powerful policy reasons (*id.* at 275–76, 108 S.Ct. at 2384–85 (citations and footnote omitted)):

Second, the policy grounds for the general rule making receipt the moment of filing suggest that delivery to prison authorities should instead be the moment of filing in this particular context. As detailed above, the moment at which *pro se* prisoners necessarily lose control over and contact with their notices of appeal is at delivery to prison authorities, not receipt by the clerk. Thus, whereas the general rule has been justified on the ground that a civil litigant who *chooses* to mail a notice of appeal assumes the risk of untimely delivery and filing, a *pro se* prisoner has no choice but to hand his notice over to prison authorities for forwarding to the court clerk. Further, the rejection of the mailbox rule in other contexts has been based in part on concerns that it would increase disputes and uncertainty over when a filing occurred and that it would put all the evidence about the date of filing in the hands of one party. These administrative concerns lead to the opposite conclusion here. The *pro se* prisoner does not anonymously drop his notice of appeal in a public mailbox—he hands it over to prison authorities who have well-developed procedures for recording the date and time at which they receive papers for mailing and who can readily dispute a prisoner's assertions that he delivered the paper on a different date. Because reference to prison mail logs will generally be a straightforward inquiry, making filing turn on the date the *pro se* prisoner delivers the notice to prison authorities for mailing is a bright-line rule, not an uncertain one. Relying on the date of receipt, by contrast, raises such difficult to resolve questions as whether delays by the United States Postal Service constituted excusable neglect and whether a notice stamped "filed" on one date was actually received earlier. These questions are made particularly difficult here because any delays might instead be attributable to the prison authorities' failure to forward the notice promptly. Indeed, since, as everyone concedes, the prison's failure to act

promptly cannot bind a *pro se* prisoner, relying on receipt in this context would raise yet more difficult to resolve questions whether the prison authorities were dilatory. The prison will be the only party with access to at least some of the evidence needed to resolve such questions—one of the vices the general rule is meant to avoid—and evidence on any of these issues will be hard to come by for the prisoner confined to his cell, who can usually only guess whether the prison authorities, the Postal Service, or the court clerk is to blame for any delay.

By direct parity of reasoning, Section 2254 Rule 3 is entitled to an identical reading—no better, no worse. And that means the identical application of the mailbox rule to habeas cases in the District Court as well as in the Court of Appeals.

Although *Banks* then purports to find "further and compelling evidence that the Supreme Court does not intend *Houston* to apply to Section 2254 cases" in the fact that App.R. 4(c) was then amended post-*Houston* while Section 2254 Rule 3 was not, that betrays a basic misunderstanding of the manner in which amendments to the various sets of rules of practice and procedure are proposed and adopted. It is a mistake to think of the Supreme Court as a self-starter in the revision of such rules, as though it is somehow responsible for creating a seamless web that permits negative inferences to be drawn from its having amended part of one set of

rules without amending part of another set that may cover a similar subject. It is not. Instead there are totally separate Judicial Conference Advisory Committees (in this instance the Advisory Committee on Appellate Rules initiates proposed amendments to those Rules, while as to the Section 2254 Rules it has been the Advisory Committee on Criminal Rules)—and each such Advisory Committee is independently responsible for providing input to the Judicial Conference's Standing Committee on Rules of Practice and Procedure as a result of the particular Advisory Committee's studies and meetings. Several steps, which normally take a period of several years, must ensue before any proposed amendment ultimately reaches the Supreme Court, which then sends it on to Congress by a May 1 date with a notification that the amendment will take effect on the following December 1 in the absence of congressional action to the contrary.[3] In short, it is simply wrong to view the Supreme Court's adoption of App.R. 4(c) to conform to *Houston* at the instance of the Advisory Committee on Appellate Rules, while no parallel rule was launched by the Advisory Committee on Criminal Rules as to Section 2254 Rule 3, as having any significance whatever—even inferentially.

Both asserted grounds for declining to apply the mailbox rule to the habeas situation in the District Court have thus fallen of their own weight.[4] This Court therefore declines

---

**3.** This Court has served by appointment by the Chief Justice as a member of the Advisory Committee on the Rules of Evidence ever since that committee was reestablished several years ago following a hiatus of more than 15 years. As such, this Court is well aware of the difficulty faced by the umbrella Standing Committee in trying to mesh the several sets of rules for consistency, an effort that *never* succeeds in the seamless web sense referred to earlier in the text of this opinion.

**4.** By way of passing comment in a footnote, *Banks* also disclaims the applicability of this District Court's General Rule ("GR") 11(B), which specifically codifies the *Houston* mailbox rule for complaints filed in "civil actions" by inmates who seek to proceed in forma pauperis. Although to be sure *Martin v. United States*, 96 F.3d 853, 855 (7th Cir.1996) does speak of habeas as "more accurately regarded as being sui generis ... than as being either civil or criminal"

and, as already noted, it is true that possible amendments to the Section 2254 Rules are sometimes considered by the Advisory Committee on Criminal Rules, the fact remains that *Martin*, 96 F.3d at 855 does recognize habeas proceedings as "technically civil proceedings." And more importantly:

> 1. *Houston*, 487 U.S. at 272, 108 S.Ct. at 2383 expressly confirmed the civil action nature of a petition for habeas corpus, and it therefore pointed to App.R. 4(a)(1) dealing with appeals in *civil* cases in undertaking its analysis.
> 2. Congress itself, in establishing the filing fee for habeas actions, sets out that $5 filing fee as an exception within the section that establishes a $150 filing fee for all other *civil* actions (Section 1914(a)).

Thus there is no real room for any persuasive argument that GR 11(B) does not—despite its express language—apply with equal force to ha-

to follow *Banks* and the minority of other courts that have also failed to follow *Houston* to its logical end.

█ But unfortunately for Barnes, this Court's closer scrutiny of the issues for purposes of the just-completed ruling has led it to grant Gilmore's[5] motion on the other ground that he advances in the current motion for reconsideration—that relating to Barnes' untimely payment of the filing fee. As quoted earlier, Section 2254 Rule 3(a) requires that a habeas petition must "also be accompanied by the filing fee prescribed by law unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis." And in this instance the record evidence is that Barnes did timely submit to the prison authorities the affidavit for that purpose that is further required by Section 2254 Rule 3(a), although that portion of his original documentation was somehow mislaid in transit.

But Barnes' problem in that respect is that his application and the accompanying certificate and printout regarding his trust fund account at Pontiac Correctional Center reflected that he had $98.80 in free funds as of April 18, 1997, just before he delivered his Petition and the accompanying application to the prison authorities. In that light, and given the extremely modest $5 filing fee that Congress has prescribed for habeas petitions in Section 1914(a), there is no way in which Barnes' application for leave to proceed without payment of the filing fee—his application for in forma pauperis treatment—can be regarded as having been presented in good faith. It is highly relevant that Barnes' November 17, 1997 filing (his Response to Respondent's Motion To Dismiss Petitioner's Petition for Habeas Corpus Relief) includes as its Ex. A his April 22, 1997 Request for Payment out of his account, in which he requested and authorized the payment of postage for mailing his Petition to this District Court (a request that was stamped "Paid Apr. 23, 1997"). Nothing whatever prevented Barnes from making an identical timely request for the payment of the $5

filing fee—and yet it was not until mid-July 1997, after this Court (which was not then focusing on the limitations issues dealt with here) had twice denied Barnes' efforts to obtain in forma pauperis treatment (both because it then appeared that no application to that effect had been received and because it seemed almost certain that Barnes could readily manage payment of the very small fee), that he actually paid the $5 filing fee.

If Barnes, who was fully aware of the amount that was in his trust fund account in mid-April 1997, had then delivered both his Petition and a direction to pay the $5 filing fee to the authorities at Pontiac, he would have been entitled to the benefit of the *Houston* mailbox rule for *all* purposes, so that his Petition would have been in time despite any subsequent delays on the part of the prison authorities. But he did not. Instead Barnes' delivery to the prison authorities before the April 23, 1997 watershed date did not conform to the requirements of Section 2254 Rule 3, as those requirements must be read in a situation such as this. Accordingly this Court is constrained to grant Gilmore's motion for reconsideration of the Order, and it dismisses Barnes' Petition as untimely.

---

beas filings. And as already explained, that GR is not at all inconsistent with Section 2254 Rule 3, as *Banks* would have it.

5. No bad pun is intended here, although one of this Court's law school professors was the late great Professor Grant Gilmore.